In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-3908 & 09-3914

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CHRISTOPHER C. BELL,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Western District of Wisconsin.
Nos. 97 CR 74 & 09 CR 19—**Barbara B. Crabb**, *Judge*.

ARGUED MAY 21, 2010—DECIDED OCTOBER 20, 2010

Before EASTERBROOK, *Chief Judge,* and BAUER and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* A jury convicted Christopher Bell of distributing more than five grams of cocaine base. *See* 21 U.S.C. § 841(a)(1). The district court sentenced him to 292 months in prison, revoked his previous term of supervised release, and sentenced him to an additional 60 months for violating the conditions of his supervised release by committing another crime. Bell now

appeals several of the court's evidentiary rulings and contends that the prosecutor made inappropriate comments during closing argument. His companion appeal challenges the revocation of his previous term of supervised release. After argument, at Bell's request, we ordered supplementary briefing regarding the application of the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010), to his case. We now affirm in all respects.

## I. Background

On January 13, 2009, Christopher Bell met with Brian Dorenzo in a Wal-Mart parking lot in Beloit, Wisconsin, and "fronted" him 5.69 grams of crack cocaine. Bell was unaware that Dorenzo was acting as a government informant, and he made several incriminating statements that were captured by recording equipment hidden in Dorenzo's pocket. For instance, Bell parried Dorenzo's request for a "little tester piece" by stating, "My name is the test," and assured Dorenzo, "I guarantee what they got right there is better than anything they got." Bell also mentioned that he might be difficult to contact because he frequently traveled between Beloit and other regional cities, and boasted, "I got the best dope in the Midwest." The following day, Bell and Dorenzo reconvened in the parking lot and Dorenzo paid Bell $200 in government-supplied cash for the fronted crack. The monetary transaction was not captured on tape due to an equipment malfunction.

Bell, who had recently been discharged from a federal halfway house and was still on supervised release, was

later arrested after a traffic stop and charged with distributing five or more grams of cocaine base in connection with the January 13 transaction. *See* 21 U.S.C. § 841(a)(1). At his trial, the government played for the jury and introduced into evidence the two-minute audio recording of the January 13 transaction. It also called Dorenzo, who explained that he began cooperating with law enforcement officials after Bell approached him at the halfway house and tried to get him to sell cocaine. Dorenzo related his version of events, including the details of his pre-transaction preparations (such as the search of his person and car) and his post-transaction payment by law enforcement. The government also presented the testimony of five law enforcement officers involved with the controlled buy, several of whom testified about viewing the drug transaction and subsequent settling up. One of them testified about a video she took of Bell in the Wal-Mart parking lot near the time of the deal; the video was played for the jury and introduced into evidence.

Bell took the stand in his own defense. He denied delivering crack to Dorenzo. Instead, he explained that he had a "giving heart" and often loaned money and provided other assistance to halfway house residents like Dorenzo, who were short on cash and could not readily obtain items like weight loss pills. Tr. 72, Sept. 15, 2009. Bell testified that he and Dorenzo had discussed Bell's weight loss and that Dorenzo had expressed an interest in trying Hydroxycut, a brand of diet pills to which Bell attributed his success, but did not have the money to purchase the pills. (Hydroxycut pills can be

legally purchased over the counter.) Bell testified that he agreed to give Dorenzo some Hydroxycut pills as well as a $200 loan. Bell said that on January 13, he met Dorenzo at Wal-Mart and gave him ten Hydroxycut pills and two one-hundred dollar bills. (The officers who searched Dorenzo and his car after the Wal-Mart rendez-vous testified that they found neither cash nor pills.)

Bell maintained that the tape recording of the January 13 meeting was consistent with his account. According to Bell, when he said, "I got the best dope in the Midwest," he was referring to the Hydroxycut pills. He also testified that the term "dope" was not used to refer to crack cocaine in the Beloit, Wisconsin, area, and that individuals in his social circle often referred to their personal geo-graphic origins (i.e., "the Midwest") when "conversating" with one another. He further explained that he was referring to his own positive experience with Hydroxycut pills when he said, "My name is the test."

Bell's "giving heart" theory was supported by his brother-in-law and a former halfway house resident, who testified that Bell loaned them money and that Bell and others referred to diet pills as "dope." Bell also put forth the alternative theory that Dorenzo set him up to get him back in prison so incarcerated gang members could carry out a retaliatory "hit" on him. Bell's ex-wife offered testimony in support of this theory, and Bell explained that he was aware of the hit and had men-tioned his frequent travel between Midwestern cities during the January 13 transaction to throw Dorenzo (and the gang) off his trail.

Over Bell's relevance objection, the government cross-examined Bell about a letter he sent to Reggie Booker, a former roommate of his at the halfway house. In the letter, which was admitted into evidence in full as Government Exhibit 9, Bell wrote to Booker, "I need you to testify to the truth of me loaning money, too you like $20 and you would give it back. . . . Also that I was loaning money too people and they would give me extra back . . . ." The letter went on to ask Booker to testify that Bell lost weight by walking, working out, and using Hydroxycut and Lipo-6 diet pills. The letter further instructed Booker to testify about "the times you would call me to bring you CD's I would make or bring you food," and asked him to "explane that how we use too talk about how we hated drugs, and would never go back too that lifestyle, also, explane how I felt like my life, was endanger and knew that it was a hit out on my life." At the top of the letter, Bell directed Booker to "Please get rid of this in the to[ilet] when your done," and at the bottom he reiterated, "Please get rid of this when done reading." (All errors in original.) Bell admitted that he wrote the letter and sent it to Booker a few weeks before trial, but denied that he was attempting to sway Booker's testimony.

The government also called Booker as a rebuttal witness over Bell's relevancy, prejudice, and "other acts" propensity objections. Booker testified that Bell called him and sent him two letters about testifying in the case, including Exhibit 9. He stated that he was not conforming his testimony to Bell's requests because he did not want to commit perjury. Booker instead testified

that after Bell's release from the halfway house he returned frequently to visit Booker. Booker explained that while Bell did bring him things like CDs, the delivery of sundries was merely a guise under which Bell sought to discuss "processing cocaine" and "dope transactions" with him. On one occasion, Booker testified, Bell asked him to cook five kilograms of cocaine into crack.

Bell returned to the witness stand on surrebuttal and denied asking Booker to cook cocaine. He also denied that the letters were an attempt to influence Booker's testimony. Bell characterized the letters as attempts to get Booker to come to trial to testify about the truth; he explained that he "wanted him to come testify because he knew the truth about me loaning money to different individuals such as his [sic] self, bringing discs for him, food there for him." Tr. 148, Sept. 15, 2009. The defense did not present any further surrebuttal.

During closing argument, the government quoted from and played for the jury the tape of Bell's meeting with Dorenzo. It also walked the jury through the other evidence against Bell, including Booker's testimony that Bell solicited him to cook crack cocaine. The defense made no objections, though it did ask the court to instruct the jury that it could only use Bell's request that Booker cook cocaine as evidence of Bell's credibility. The court delivered the requested instruction. After deliberating for a short period, the jury found Bell guilty of violating 21 U.S.C. § 841(a)(1).

The district court later sentenced Bell to a within-Guidelines prison term of 292 months, to be followed by 96 months of supervised release. The court also found that Bell's new conviction constituted a "Grade A" violation under the Sentencing Guidelines, *see* U.S.S.G. § 7B1.1(a)(1), and, in accordance with 18 U.S.C. § 3583(g)(1) and U.S.S.G. § 7B1.3(a)(1), revoked his supervised release. It sentenced him to the statutory maximum of 60 months' imprisonment for violating the conditions of his supervised release, but ordered that the time be served concurrently with his 292-month sentence.

## II. Discussion

Bell challenges the admission of his letter to Booker, the admission of Booker's rebuttal testimony about Bell asking him to cook five kilograms of crack, and the propriety of the government's closing argument. He also seeks the benefits of the recently enacted Fair Sentencing Act of 2010. We consider his arguments in turn.

## A. Bell's Letter to Booker

Bell's first contention is that the district court erred when it admitted the letter he wrote to Booker. We ordinarily review a district court's admission of evidence for abuse of discretion, *see United States v. Gorman*, 613 F.3d 711, 717 (7th Cir. 2010), but here we review only for plain error because Bell's present argument—that admission of the letter violated Fed. R. Evid. 608(b)—rests on different grounds than the relevance objection he

lodged at trial, *United States v. Swan*, 486 F.3d 260, 264 (7th Cir. 2007); *see also* Fed. R. Evid. 103(a)(1). "Under plain-error review, the defendant must show that (1) there was error, (2) it was plain, (3) it affected his substantial rights and (4) the court should exercise its discretion to correct the error because it seriously affected the fairness, integrity or public reputation of the judicial proceedings." *United States v. Jumah*, 599 F.3d 799, 811 (7th Cir. 2010); *see also Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009).

While cross-examining Bell, the government asked him about Booker. Bell objected on relevancy grounds, and at sidebar the government explained that it wanted to ask Bell about the letter. It further explained that the letter "goes to his contacting the witnesses and trying to have them testify to his theory of the defense." Tr. 115, Sept. 15, 2009. After reading the letter, the district court allowed the questioning and received the letter over Bell's objection even though the government never formally moved for its admission. The government did not publish the letter to the jury. It instead asked Bell questions like, "Now in that letter, you told him about how you would loan people money; is that right?", "[Y]ou told him at the top of the letter that you wanted him to flush the letter down the toilet, is that correct?", and "[Y]ou were subtly trying to tell him what to say, is that right?" Tr. 118-19, Sept. 15, 2009. Bell readily acknowledged that he wrote the letter, and affirmed that in it he told Booker about his paternalistic activities. He denied that he was trying to tell Booker how to testify. What he was really doing with the letter, he said, was asking Booker "in the context of the letter" to

come tell the truth at trial. Tr. 119, Sept. 15, 2009. The government ended its questioning once Bell denied attempting to influence Booker. On redirect, Bell testified that he "did not volunteer to write" Booker and explained that he only did so because Booker inquired about his case and he did not want to talk about it on the phone. Later, when the jury asked to see the letter during deliberations, Bell argued for it to go back in its entirety.

Bell was wise to abandon his relevancy objection on appeal. The letter was relevant not only to Bell's credibility and that of his "giving heart" defense but also to his consciousness of guilt. *See United States v. Miller*, 276 F.3d 370, 373-74 (7th Cir. 2002); *United States v. Shorter*, 54 F.3d 1248, 1251-52, 1260 (7th Cir. 1995). His present theory is no more successful.

Even if we were to assume that Rule 608(b) is relevant here and that the district court plainly erred in failing to apply it—which we doubt, given that the letter was used to undermine Bell's credibility and defense theory and not to prove any misconduct on his part, *see* Fed. R. Evid. 608(b)—Bell cannot satisfy the exacting plain error standard because he has not demonstrated that he was seriously prejudiced by the admission of the letter. *See United States v. McGee*, 612 F.3d 627, 631 (7th Cir. 2010) (noting that an adverse effect on one's substantial rights in the plain error context generally "means serious prejudice"). Indeed, Bell's minimally developed argument regarding the letter does not suggest that it affected his substantial rights in any way. The record likewise

does not support such a finding. *See United States v. Ali*, ___ F.3d ___, No. 06-3951, 2010 WL 3365289, at *4 (7th Cir. Aug. 27, 2010). To the contrary, it shows that Bell, not the government, published the letter using the courtroom's video display system and later insisted that the letter be provided to the jury during deliberations. Moreover, the case against Bell was strong. He concedes that the evidence was sufficient to support his conviction, *see* Reply Br. 8, and we agree that the government's case would not have been significantly less persuasive had the letter been excluded on any theory. *Cf. United States v. Cooper*, 591 F.3d 582, 590 (7th Cir.) (discussing harmless error analysis), *cert. denied*, 130 S. Ct. 3530 (2010). We therefore affirm the district court's admission of the letter.

### B.  Booker's Testimony

After Bell rested his defense, the government sought to introduce rebuttal testimony from the recipient of the letter, Bell's halfway house roommate Booker. At sidebar, the government explained that Booker would testify that Bell directed him to testify about Hydroxycut and loans. It also proffered that Booker would testify that Bell solicited him to cook crack cocaine. Bell objected to Booker taking the stand. The government explained that Booker's testimony would speak "directly to their defense that Mr. Bell is—all he does is loan money and use Hydroxycut pills, and this cuts right to—actually, it corroborates Mr. Dorenzo and cuts right against their defense in this particular case." Tr. 124, Sept. 15, 2009; *see also id.* at 125-26.

The district court accepted this characterization and overruled Bell's objections. The court explained:

> Mr. Bell was writing Mr. Booker. He was saying remember we did this, we did this, we did this. It adds a lot of weight to the letter and the letter was intended to show, when Mr. Booker testifies, in fact we were not talking just about Hydroxycut, we're talking about cooking crack cocaine. So I think it is admissible for that purpose.

> Sure, it shows propensity, but it shows something else independently, which I think is highly relevant to Mr. Bell's guilt or innocence and it's not going to be prejudicial.

Tr. 127, Sept. 15, 2009. Booker took the stand and told the jury that Bell solicited him, both to cook five kilograms of cocaine and to testify.

Bell contends that Booker's testimony about the solicitation to cook five kilograms of crack was not proper rebuttal evidence but instead was overly prejudicial propensity evidence that the district court failed to adequately explain its reasons for admitting. He also asserts that Booker's testimony about cooking cocaine was impermissible extrinsic evidence of his (Bell's) character for untruthfulness. *See* Fed. R. Evid. 608(b). We review the admission of rebuttal evidence for abuse of discretion. *United States v. Grintjes*, 237 F.3d 876, 879 (7th Cir. 2001). Because Bell did not object to the testimony on Rule 608(b) grounds at trial, however, we review any Rule 608(b) rulings only for plain error. *See Swan*, 486 F.3d at 264; *see also* Fed. R. Evid. 103(a)(1).

The proper uses of rebuttal evidence include the contradiction, impeachment, or defusion of the impact of the evidence offered by an adverse party. *Grintjes*, 237 F.3d at 879. The district court did not abuse its discretion in concluding that Booker's testimony would accomplish those ends. Bell's theory of the case was that he was merely providing Dorenzo with diet pills and a loan and that Dorenzo set him up by telling the police that Bell gave him cocaine. Bell advanced this theory not only with his own testimony, *see* Tr. 72, Sept. 15, 2009 ("I got a giving heart, man, and I was helping different guys there because I had money and stuff like that."), but also by calling witnesses who testified that Bell loaned them money while they were in the halfway house. Booker's testimony that Bell's good deeds, like bringing food and other items to struggling halfway house inmates, were undertaken with ulterior motives vitiated the "giving heart" aspect of the defense. Booker's testimony both defused the impact of and contradicted Bell's evidence. It also impeached the witnesses who testified on his behalf. *See Grintjes*, 237 F.3d at 879. The evidence was properly admitted as rebuttal evidence.

Bell contends, however, that even if the testimony was proper rebuttal, it should have been excluded because it was propensity evidence that did nothing more than invite the jury to infer that he was a large-scale drug dealer and was acting as such when he met Dorenzo at the Wal-Mart. *See* Fed. R. Evid. 404(b). He further asserts that the government's stated purpose for the evidence—to damage his credibility—was disingenuous, and that the mere fact that the jury heard testimony

about such a large quantity of drugs unduly prejudiced him.

"It is black-letter law that the government cannot introduce evidence of a defendant's prior bad acts to show [his] propensity to commit the charged crime." *United States v. Ciesiolka*, 614 F.3d 347, 355 (7th Cir. 2010). To comply with Rule 404(b), however, all the government need show is a purpose other than to establish the defendant's propensity to commit crimes. *United States v. Edwards*, 581 F.3d 604, 608 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 1301 (2010). One purpose that is recognized despite its absence from Rule 404(b)'s nonexclusive list is "to attack the credibility of a witness' testimony by means other than attacking the witness' general character for truthfulness." *Serafinn v. Local 722, Int'l Bhd. of Teamsters*, 597 F.3d 908, 915 (7th Cir. 2010). "The focus of inquiry should be on whether the prior-crimes evidence is relevant (other than to show propensity, which may be relevant to guilt, but is impermissible as evidence) to an issue in the case, and, if so, whether the probative weight of the evidence is nevertheless substantially outweighed by its prejudicial effect or by its propensity to confuse or mislead the jury." *Edwards*, 581 F.3d at 608.

Here, the government asserted that Booker's testimony was relevant to impeach Bell. While the government did not articulate a separate theory of relevancy for Booker's testimony about the quantity of cocaine Bell asked him to cook, it is evident from the trial transcript that the government was eliciting the information to enhance Booker's credibility, thereby increasing the

impeaching power of his testimony. The five-kilogram quantity to which Booker testified corroborated Booker's testimony that Bell asked him to cook the cocaine and made it more probable that Bell would come by to discuss the deal in person, under the guise of bringing Booker items like CDs. The evidence was not introduced as propensity evidence, the quantity was mentioned only once, and, to mitigate any potential danger that the jury would make any inappropriate inferences, the district court delivered a limiting instruction at the close of trial. *See United States v. Vargas*, 552 F.3d 550, 557 (7th Cir. 2008) ("[W]e assume that limiting instructions are effective in reducing or eliminating unfair prejudice."). The district court did not abuse its discretion in overruling Bell's "other acts" objection, and it adequately, if somewhat inarticulately, explained its reasons for allowing Booker's testimony.

It likewise did not plainly err by failing to exclude the testimony pursuant to Rule 608(b). Booker's quantity testimony was not introduced as a specific instance of conduct, nor was it introduced as extrinsic evidence to prove or disprove the testimony of Bell or any other witness; it merely rounded out Booker's story. The district court's failure to exclude the testimony on Rule 608(b) grounds was not an error, let alone a plain or obvious one.

## C.  Government's Closing Argument

Bell's next contention is that the government's closing and rebuttal arguments amounted to little more than inappropriate propensity arguments. Bell's failure to

object to the arguments during trial "relegates our review to that of plain error, which requires [him] to establish 'not only that the remarks denied him a fair trial, but also that the outcome of the proceedings would have been different absent the remarks.'" *United States v. Bowman*, 353 F.3d 546, 550 (7th Cir. 2003) (quoting *United States v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2003)). Even absent the strictures of plain error review, our two-part test for improper prosecutorial comments is difficult to satisfy. *See United States v. McMath*, 559 F.3d 657, 667 (7th Cir. 2009) ("As a general matter, improper comments during closing arguments rarely rise to the level of reversible error, and considerable discretion is entrusted to the district court to supervise the arguments of counsel." (quotation omitted)), *cert. denied*, 130 S. Ct. 373 (2010); *United States v. Recendiz*, 557 F.3d 511, 523 (7th Cir. 2009) ("[O]verturning a conviction due to a prosecutor's improper comments is no easy feat." (emphasis omitted)). First, we "consider the prosecutor's disputed remarks in isolation to determine whether they are improper." *McMath*, 559 F.3d at 667 (quotation omitted). If the comments are improper standing alone, we then move to step two of our inquiry, wherein we consider the remarks in the context of the record as a whole and assess whether they denied the defendant his right to a fair trial. *See id.*

Bell argues that the government's closing and rebuttal arguments center around the propensity-tinged theme that Bell is a drug dealer. Curiously, though, Bell does not direct our attention to the government's assertion that the audiotape of the January 13 transaction depicted "a

crack dealer trying to make a sell." Tr. 167, Sept. 15, 2009.
He instead points to the government's quotation of the
audiotape—"I've got the best dope in the Midwest," Tr.
162, Sept. 15, 2009—and its reminder to the jury that
Booker "told you this defendant solicited him to cook
crack cocaine," *id.* at 168. As to the rebuttal argument,
Bell takes issue with the government's repeated inquiry
of whether it was "just a coincidence" that Bell "asked
Dorenzo to participate in this drug endeavor," that
Dorenzo's testimony supported its interpretation of the
"best dope in the Midwest" statement, that no diet pills
or money were found on Dorenzo, and that Booker
said that Bell "solicited him in dealing crack cocaine." *Id.*
at 198-99.

The comments with which Bell takes issue are not
improper. The jury heard an audiotape of Bell telling
Dorenzo that he had the best dope in the Midwest. The
government was permitted to remind the jury of this
statement and weave the statement into its theory of the
case. We are not sure exactly what "propensity aspects"
Bell sees in the "best dope" statement, *see* Appel-
lant's Br. 29, particularly where he does not dispute
the authenticity of the tape, but even if there were any
the government implored the jurors to be "the judges
of what that audio means and in what context it was
said." Tr. 167, Sept. 15, 2009. That's not a propensity
argument; it's an accurate statement of the jury's respon-
sibility.

The government's references to Booker's testimony
were equally proper. The first time the government

mentioned Booker's testimony, it was plainly an attempt to undermine Bell's credibility. "Of course the defendant had an answer for everything. He's had that transcript. He knew exactly what to say. But he didn't have an answer for Mr. Booker when Mr. Booker testified in this case; his roommate at the halfway house, a person he had just sent a letter to two weeks ago, a person who told you this defendant solicited him to cook crack cocaine." Tr. 168, Sept. 15, 2009. Impugning Bell's credibility was both the ostensible and permissible purpose for which Booker's testimony about the solicitation was admitted, and, at any rate, "[t]he government is allowed to comment on the credibility of a witness . . . as long as the comment reflects reasonable inferences from the evidence adduced at trial rather than personal opinion." *United States v. Nunez*, 532 F.3d 645, 654 (7th Cir. 2008) (quotation omitted). This reference to Booker's testimony was not improper.

The second mention of Booker's testimony to which Bell points is perhaps more questionable but we conclude that it too is not improper. Bell directs us to the government's rebuttal argument, where it provided a lengthy recitation as to why Bell's theory of the case was illogical in the face of the evidence admitted against him. The government began this line of argument with, "This defendant chose Brian Dorenzo. . . . They were in the halfway house together. That's why he asked Dorenzo to participate in this drug endeavor. That's why the defendant delivered crack to Dorenzo." It went on to encourage the jury to "think about this logically," and asked the jury a series of rhetorical questions using the

phrase, "is it just a coincidence that . . . ." After asking the jury about the January 13 audiotape and the lack of diet pills and money found on Dorenzo, the government asked, "Is it just a coincidence that yeah, Mr. Booker saying that the defendant solicited him in dealing crack cocaine? I mean that's really what it boils down to. You have to take these arguments and logically think through them." Tr. 198-99, Sept. 15, 2009.

Bell contends that this spiel is exemplary of the government's attempt to persuade the jury that he was a drug dealer. He highlights the government's use of the term "endeavor," its reference to "the best dope in the Midwest," and its mention of Booker's testimony regarding Bell's alleged "solicitation" of him. Bell is correct that "arguing to a jury that it should convict a defendant based on the defendant's propensity to commit a crime" is improper, *United States v. Simpson*, 479 F.3d 492, 503 (7th Cir. 2007), even if the government did not intend to suggest an improper propensity inference, *id.* at 504 n.3. But he is mistaken that the comments to which he points constitute propensity arguments. The word "endeavor" was a reasonable, non-inflammatory descriptor of Bell's parking-lot dealings with Dorenzo. And, as discussed above, the use of Bell's own words, "I got the best dope in the Midwest," was not improper either.

To the extent that the government's argument invited the jury to consider Booker's solicitation testimony as substantive evidence in the case rather than evidence pertaining only to Bell's credibility, there is perhaps

some danger that it could lead the jury down the propensity path. But when the comment is considered as part of the broader argument about the frailty of Bell's defense, as well as in the context of the record as a whole, any incipient propensity simply does not crystallize. The government was not arguing that Bell was the type of person who would front drugs to Dorenzo, or even that he did something similar in the past and so should be convicted here; it argued that its theory of the case was more persuasive than Bell's. Even if that was a propensity argument, however, Bell is unable to demonstrate that he was prejudiced in any way.

"In determining prejudice, we consider the following factors: (1) whether the prosecutor misstated the evidence; (2) whether the remark implicated a specific right; (3) whether the defendant invited the remark; (4) whether the district court provided (and the efficacy of) a curative instruction; (5) whether the defendant had an opportunity to rebut the remark; and (6) the weight of the evidence against the defendant." *United States v. Myers*, 569 F.3d 794, 799 (7th Cir. 2009) (quoting *United States v. Clark*, 535 F.3d 571, 580-81 (7th Cir. 2008)). Here, these factors militate in favor of the government, particularly under the additional burden of our plain error review. The government did not misstate the evidence, nor did it implicate a specific right. Bell discussed Booker's testimony during his closing argument and urged the jury to infer that Booker was unreliable because he confused dates and had four felony convictions. The government responded in kind, casting doubt

on Bell's theory and asking the jury to consider how Booker's testimony fit into the broader evidentiary picture. Bell had no opportunity to rebut the remark, but the district court provided a curative instruction to the jury, admonishing it to consider Booker's testimony "only on the question of defendant's credibility." Though Bell disputes the efficacy of this instruction, he does so largely by mischaracterizing a concurring opinion's discussion of potential infirmities inherent in Pattern Criminal Jury Instruction for the Seventh Circuit 3.04, the clear foundation of the instruction the district court delivered to the jury. The instruction here was sufficiently specific as to "effectively distinguish appropriate from inappropriate inferences." *United States v. Jones*, 455 F.3d 800, 812 (7th Cir. 2006) (Easterbrook, J., concurring). Most importantly, though, the evidence against Bell was overwhelming. This case was not, as Bell contends, a mere swearing contest between Bell and Dorenzo. The government had an audiotape, a videotape, the drugs that changed hands, and a significant amount of eyewitness testimony to support its theory. The single, minimally questionable comment about Booker's testimony during rebuttal argument did not make or break the government's case, and the district court did not err in permitting it.

## D.  Application of the Fair Sentencing Act

On August 3, 2010, President Obama signed into law the Fair Sentencing Act of 2010 ("FSA"). The FSA amended the Controlled Substances Act and Controlled

Substances Import and Export Act by resetting the drug quantities required to trigger mandatory minimum sentences. As is relevant here, the minimum quantity of crack required to trigger the mandatory minimum was increased from 5 grams to 28 grams. *Compare* 21 U.S.C. § 841(b)(1)(B)(iii)(2008) *with* 21 U.S.C. § 841(b)(1)(B)(iii) (2010). If Bell were sentenced today under the FSA, his distribution of 5.69 grams of crack cocaine would be insufficient to trigger the mandatory minimum sentencing provisions; he would be subject only to a 30-year (360-month) maximum. *See* 21 U.S.C. § 841(b)(1)(C) (2010).

Three days after the FSA was enacted, Bell, who had not previously challenged any aspect of his sentence, filed a pro se motion for leave to file a supplemental brief regarding the application of the FSA to his case. We granted Bell's motion, ordered his court-appointed counsel to file a brief on his behalf, and ordered the government to file a response. After reviewing the ably prepared briefs of both parties, we conclude that the FSA is not retroactive and therefore does not apply to Bell's case.

The general federal savings statute, 1 U.S.C. § 109, provides that "[t]he repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act so shall expressly provide . . . ." "[T]he saving clause has been held to bar application of ameliorative criminal sentencing laws repealing harsher ones in force at the time of the commission of an offense." *Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 661 (1974).

We have also recognized that the application of the savings statute extends beyond mere repeals and reaches amendments to criminal statutes as well, *see United States v. Stillwell*, 854 F.2d 1045, 1047-48 (7th Cir. 1988), unless the new law by its terms applies retroactively. So if the savings statute applies to the FSA, the FSA in turn cannot operate retroactively to reduce Bell's sentence.

Like our sister circuits that have considered this issue, *see United States v. Gomes*, ___ F.3d ___, No. 10-11225, 2010 WL 3810872, at *2 (11th Cir. Oct. 1, 2010); *United States v. Carradine*, ___ F.3d ___, No. 08-3220, 2010 WL 3619799, at *4-*5 (6th Cir. Sept. 20, 2010), we conclude that the savings statute operates to bar the retroactive application of the FSA. Bell's arguments to the contrary are novel but ultimately unpersuasive.

First, he argues that the FSA does not "release or extinguish any penalty," and therefore should not be subject to the savings statute. In his view, the FSA merely "redefines" the groups "serious" drug traffickers and "major" drug traffickers," two groups at whom Congress originally aimed the stiff mandatory minimum sentences for drug crimes. He rests this argument on *United States v. Kolter*, 849 F.2d 541 (11th Cir. 1988), in which the Eleventh Circuit concluded that the savings statute did not bar the retroactive application of a new definition of the term "convicted felon" because the redefined term invalidated case law, not a statute, and because the redefinition did not affect punishment prescribed, just the class of individuals subject to it. *Id.* at 544. The present case is distinguishable from *Kolter*, however, in that the

FSA expressly amended the punishment portion of 21 U.S.C. § 841. Additionally, the terms "serious" and "major" drug traffickers do not appear in either the preexisting or FSA-amended versions of 21 U.S.C. § 841. They were employed by the House as part of its findings relating to the initial version of the Fair Sentencing Act it passed, *see* Drug Sentencing Reform & Cocaine Kingpin Trafficking Act of 2009, H.R. 265, 111th Cong. § 2(3), (4) (2009), but their absence from the enacted version of the bill, coupled with *Kolter*'s emphasis on statutory redefinition, renders Bell's argument unavailing.

Bell also contends that the savings statute should not bar the retroactive application of the FSA because the FSA is "curative" or "remedial." *See Marrero*, 417 U.S. at 661 ("[T]he general saving clause does not ordinarily preserve discarded remedies or procedures . . . ."). Though the terminology he employs is different from his first argument (and appears to conflate "remedial" with "remedy"), his underlying contention is substantially similar. That is, he attempts to fit the FSA into one of the narrow exceptions to the savings statute, this time statutes that primarily affect "procedures" or "remedies." *See United States v. Blue Sea Line*, 553 F.2d 445, 448 (5th Cir. 1977) ("If a statutory change is primarily procedural, it will take precedence over prior law in such cases; if the change affects a penalty, the saving clause preserves the pre-repeal penalty."). This argument falters for the same reason as the first: the FSA expressly amended the punishment portion of 21 U.S.C. § 841. No procedures or remedies were altered by the passage of the FSA. Unlike the statutes analyzed in *Blue Sea Line* and *United States v. Mechem*, 509 F.2d 1193 (10th Cir. 1975), which were

aimed at overhauling the Shipping Act of 1916 and the Federal Juvenile Delinquency Act, respectively, the FSA's predominant purpose was to change the punishments associated with drug offenses. The savings statute therefore prevents it from operating retroactively absent any indication from Congress. And since the FSA does not contain so much as a hint that Congress intended it to apply retroactively, it cannot help Bell here.

### III. Conclusion

Bell's evidentiary objections to the letter and to Booker's testimony cannot overcome the highly deferential standards of review we apply to evidentiary determinations. His contention that the government improperly employed propensity arguments during its closing and rebuttal arguments is similarly unable to clear the high bar of plain error review. We therefore need not consider independently the merits of his request to overturn the revocation of his supervised release, as that claim that could only succeed if his conviction were rendered invalid. We AFFIRM both Bell's conviction and the resultant revocation of his previous term of supervised release. We also AFFIRM Bell's sentence, to which the Fair Sentencing Act of 2010 does not apply.