# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1266

_____

United States of America,

      Plaintiff - Appellee,

v.

Anthony Norris Smith,

      Defendant - Appellant.

\*
\*
\*
\*
\* Appeal from the United States
\* District Court for the
\* Southern District of Iowa.
\*
\*
\*

_____

Submitted:  October 22, 2010
Filed: January 31, 2011

_____

Before LOKEN, SMITH, and COLLOTON, Circuit Judges.

_____

LOKEN, Circuit Judge.

A jury convicted Anthony Smith of conspiring to distribute fifty grams or more of cocaine base ("crack") in violation of 21 U.S.C. §§ 841 and 846.  Based on this drug quantity and his prior felony drug convictions, the district court[1] imposed the mandatory minimum sentence of life in prison.  See 21 U.S.C. § 841(b)(1)(A) (2006). Smith appealed his conviction and sentence, arguing (i) the evidence was insufficient to convict him of conspiracy to distribute crack; (ii) the district court violated the Sixth Amendment by refusing his request to subpoena a defense witness and by

---

[1]The Honorable John A. Jarvey, United States District Judge for the Southern District of Iowa.

admitting a forensic chemist's lab report; and (iii) the life sentence was grossly disproportionate and therefore violated the Eighth Amendment. After the parties submitted briefs on these issues, Congress enacted the Fair Sentencing Act of 2010, which increased the amount of crack necessary to trigger a mandatory life sentence from 50 to 280 grams. Pub. L. No. 111-220, § 2(a)(1), 124 Stat. 2372 (Aug. 3, 2010), codified at 21 U.S.C. § 841(b)(1)(A)(iii). At Smith's request, the parties submitted supplemental briefs addressing his additional contention that this Act should apply to the mandatory life sentence in his pending case. We affirm.

## I. Sufficiency of the Evidence

Smith argues the evidence was insufficient to support the jury's verdict that he conspired to distribute crack cocaine. We review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the verdict and accepting all reasonable inferences that support the verdict. United States v. Hernandez, 569 F.3d 893, 896 (8th Cir. 2009), cert. denied, 130 S. Ct. 1308 (2010).

At trial, Iowa City detective and Drug Enforcement Agency task-force member Jerry Blomgren testified that Jeffery Pickett was arrested on January 17, 2008, after a series of controlled buys by a confidential informant. Pickett agreed to participate in a controlled buy from one of his crack sources, Anthony Smith, also known as "Red." Pickett placed a call on his cell phone to the number listed for "Redy" and arranged to purchase crack. Pickett was searched, outfitted with a hidden transmitter, provided $200 in serialized bills, and driven to an apartment building in Coralville, Iowa. Special Agent Charles Pettrone accompanied Pickett to the door of apartment 11 and watched as Pickett entered the apartment and exited a minute later with baggies containing five rocks weighing 3.5 grams that were later tested and found to contain three grams of crack. A subsequent warrant search of apartment 11 uncovered evidence that the apartment was occupied by Smith and by Patrick

Williams, as well as razor blades, sandwich bags commonly used to package drugs, fifteen cell phones, $1200 in cash, a pellet gun, and three sets of brass knuckles.

Pickett testified that Smith was the person in apartment 11 who sold the crack on January 17, that Smith introduced Pickett to selling crack, and that on six occasions Pickett, Smith, and Williams pooled their money and purchased up to 4.5 ounces of crack from drug dealers in Chicago. Witness Catherine Lair, who lived next door to apartment 11, identified Smith as her neighbor, confirmed he was known as Red, and testified she obtained a cell phone for Smith with the number called by Pickett to arrange the January 17 sale. Patrick Williams testified that he and Smith were in the business of selling crack, that Smith dealt some fifteen ounces per month, and that he (Williams) initially lied about Smith's involvement because he feared reprisal from a Chicago gang. Benjamin Boyd identified Smith as Red, estimated that he (Boyd) purchased one hundred grams of crack from Smith, and once saw Smith with a rock of crack "larger than a tennis ball." Daniel Davis testified that Smith fronted several "eight-balls" of crack (approximately 3.5 grams each) and later sold Davis about thirty grams of crack in a series of transactions. Records from the cell phone registered to Lair showed sixty-seven outgoing calls to Williams, eighteen to Pickett, twelve to Boyd, nine to Davis, and over 1000 to other persons during a twenty-one day period in late 2007 and early 2008.

Smith argues this evidence proved only his "mere presence" at drug deals or his "physical proximity" to contraband. But if credited by the jury, the evidence showed far more than one sale of crack at Smith's residence. Numerous witnesses testified to his substantial involvement in county-wide drug dealing. We have repeatedly upheld jury verdicts based solely on the testimony of cooperating witnesses. See, e.g., United States v. Buckley, 525 F.3d 629, 632-33 (8th Cir.), cert. denied, 129 S. Ct. 475 (2008). Here, cell phone records tended to corroborate the testimony of drug trafficking, particularly the sale to Pickett on January 17. The

evidence was more than sufficient to support the jury's finding that Smith participated in a conspiracy to distribute far more than fifty grams of crack cocaine.

## II. Sixth Amendment Issues

**A. Denial of the Right to Compulsory Process.** On the morning of the third and last day of trial, Smith requested that a subpoena issue to compel the attendance of James Robinson, who worked at a Knox County jail located approximately forty-five miles from the courthouse. See Fed. R. Crim. P. 17(b). Defense counsel explained that Robinson would testify that Smith and Patrick Williams were friendly while together in the jail, rebutting Williams's testimony that he lied about Smith's role in the conspiracy because he feared Smith. Counsel conceded that Robinson only observed the relationship between Williams and Smith prior to Williams agreeing to cooperate with the government. The district court denied the request "as untimely, but more importantly as cumulative of other testimony and probably not relevant or at best marginally relevant." On appeal, Smith argues the court abused its discretion by depriving him of the benefit of testimony that was relevant to the credibility of government witness Williams.

The Sixth Amendment grants a defendant the right "to have compulsory process for obtaining witnesses in his favor." However, the right is not absolute. Taylor v. Illinois, 484 U.S. 400, 414-15 (1988). To prevail on a claim that evidence was improperly excluded, a defendant must show that the excluded testimony "would have been both material and favorable to his defense." United States v. Turning Bear, 357 F.3d 730, 733 (8th Cir. 2004). When reviewing a district court's refusal to subpoena a witness for the defense, we apply this standard, considering both the timeliness of the request and the importance of the testimony to the defendant's case. See United States v. Sparkman, 500 F.3d 678, 682 (8th Cir. 2007).

-4-

In this case, we agree with the district court that Robinson's proffered testimony would not have been materially favorable to Smith's defense because it would not have impeached Williams's testimony that he feared Smith after agreeing to cooperate with the government. Testimony that Smith and Williams were friendly before Williams agreed to cooperate would have been cumulative, as other witnesses had testified the two lived together, were close friends, and held themselves out as cousins. Compare United States v. Ladoucer, 573 F.3d 628, 635 (8th Cir. 2009), cert. denied, 130 S. Ct. 1544 (2010). Moreover, the request was more untimely than the eve-of-trial request that was denied based on the "public interests in the efficient administration of justice" in Sparkman, 500 F.3d at 683. There was no error.

**B.  Denial of the Right to Confront Adverse Witnesses.**  Smith argues that the district court's admission of a forensic chemist's testimonial lab report that the five rocks purchased by Pickett contained three grams of crack violated Smith's Sixth Amendment right to confront adverse witnesses as construed in Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527 (2009). However, at trial, Smith stipulated to the admission of the report. A stipulation "is evidence introduced by both of the parties," so neither may "complain on appeal that the evidence was erroneously admitted." United States v. Hawkins, 215 F.3d 858, 860 (8th Cir.), cert. denied, 531 U.S. 972 (2000), quoting Ohler v. United States, 529 U.S. 753, 755 (2000).

### III.  Sentencing Issues.

**A.  Retroactivity of the Fair Sentencing Act.**  Smith argues that the Fair Sentencing Act of 2010 ("FSA") should apply to cases pending on appeal when the statute was enacted. The FSA increased the quantity of crack needed to trigger a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A)(iii) from 50 to 280 grams. It is unclear whether this change would affect Smith's sentence. But in any event, we have previously rejected the contention, concluding, albeit in rather summary fashion, that "the 'general savings statute,' 1 U.S.C. § 109, requires us to apply the penalties

in place at the time the crime was committed." United States v. Brewer, 624 F.3d 900, 909-10 n.7 (8th Cir. 2010); see United States v. Brown, --- Fed. App'x. ---, 2010 WL 3958760, at *1 (8th Cir. Oct. 12, 2010) (non-binding unpublished opinion). We agree with those decisions.[2]

At common law, the repeal of a criminal statute or its reenactment with reduced penalties abated a prosecution that had not reached final disposition in the highest court authorized to review the conviction and sentence. See Warden, Lewisburg Penitentiary v. Marrero, 417 U.S. 653, 660 (1974). To avoid such abatements, which were often inadvertent, Congress enacted a general savings statute, 1 U.S.C. § 109:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

This statute applies to statutory amendments as well as to repeals and reenactments. Martin v. United States, 989 F.2d 271, 274 (8th Cir.), cert. denied, 510 U.S. 979 (1993). Thus, the determinative questions are whether the FSA amended a "penalty" and, if so, whether the statute expressly provided that it applies to pending cases.

---

[2]To our knowledge, at least seven other circuits have reached the same conclusion. See United States v. Reed, --- F.3d ---, 2010 WL 5176818, at *4 (10th Cir. Dec. 22, 2010); United States v. Patillo, --- F.3d ---, 2010 WL 5018228, at *5 (3d. Cir. Dec. 9, 2010); United States v. Wilson, --- Fed. App'x. ---, 2010 WL 4561381, at *2 (4th Cir. Nov. 12, 2010); United States v. Glover, --- Fed. App'x. —, 2010 WL 4250060, at *2 (2d Cir. Oct. 27, 2010); United States v. Bell, 624 F.3d 803, 814-15 (7th Cir. 2010); United States v. Gomes, 621 F.3d 1343, 1346 (11th Cir. 2010); United States v. Carradine, 621 F.3d 575, 580 (6th Cir. 2010).

Smith argues that the FSA did not release or extinguish a "penalty." Rather, it changed the class of drug offenders who are subject to the penalty of life in prison. We squarely rejected this argument in Martin, concluding that "[i]t is simply an exercise in semantics to suggest that a change in [the class of persons subject to a penalty] does not effectively extinguish liability or punishment." 989 F.2d at 275 n.4.

Alternatively, invoking a narrow exception to the general savings statute, Smith argues that § 109 does not prevent the application of the FSA to his case because a general savings statute "does not ordinarily preserve discarded remedies or procedures." Marrero, 417 U.S. at 661. The cases cited by the Court in Marrero bear no resemblance to the issue before us. In applying this dictum to the question whether a statute amending a section of the criminal code merely "discarded remedies or procedures," we agree with the Fifth Circuit that the question is whether Congress was "making a procedural change or reassessing the substance of criminal liability or punishment." United States v. Blue Sea Line, 553 F.2d 445, 449 (5th Cir. 1977).

Here, we agree with the Seventh Circuit that § 109 applies because "the FSA expressly amended the punishment portion of 21 U.S.C. § 841. No procedures or remedies were altered." Bell, 624 F.3d at 815. The FSA is a paradigmatic example of a statute intended to ameliorate substantive criminal penalties. Its preamble expressly stated an intent to "restore fairness to Federal cocaine sentencing." Pub. L. No. 111-220, 124 Stat. 2372. Congressional leaders lauding the passage of the FSA stated that it was designed to correct "unjustified disparity" in federal sentencing provisions that previously "placed far harsher penalties on crack users and dealers than on the users and dealers of powder cocaine." 156 Cong. Rec. E1665-05, 1666 (daily ed. Sept. 16, 2010) (statement of Rep. Bob Inglis).

If it amended a criminal penalty, as we have concluded, Smith further argues that, while the FSA contains no express provision applying its reduced penalties to pending cases, we should imply such a provision from the congressional intent to

replace the "draconian" provisions of prior law. But the question is not whether Congress intended to "release or extinguish" the prior penalties. That is always the case. The question is whether Congress intended to exempt the repealing act from the general savings statute. Section 109 provides that such an exemption must be "expressly provide[d]" in the repealing statute. Even if we may disregard § 109's clear requirement that an exemption be "expressly" declared in the repealing act, which we doubt, Smith fails to call our attention to any language in the FSA from which an intent to exempt could be inferred. See Blue Sea Line, 553 F.2d at 449 ("[o]nly the narrowest of spaces is left for argument that the repealer implies that it is applicable to pending cases"). As there are no serious constitutional issues raised by the question whether § 109 applies to the FSA, Smith's reliance on the canon of constitutional avoidance falls far short of clearing this formidable hurdle.

**B. Cruel and Unusual Punishment.** Finally, Smith argues that the sentence of life in prison mandated by former 21 U.S.C. § 841(b)(1)(A) violated the Eighth Amendment's prohibition against cruel and unusual punishment. We have repeatedly rejected this contention. See United States v. Scott, 610 F.3d 1009, 1018 (8th Cir. 2010), and cases cited, cert. denied, 2011 WL 55768 (U.S. Jan. 10, 2011).

The judgment of the district court is affirmed.

_____