In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1532

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

THADDEUS A. SPEED,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 2:08-cr-20066-MPM-DGB—**Michael P. McCuskey**, *Chief Judge.*

ARGUED MAY 9, 2011—DECIDED SEPTEMBER 6, 2011

Before EASTERBROOK, *Chief Judge,* and WOOD and
WILLIAMS, *Circuit Judges*.

WOOD, *Circuit Judge.* Thaddeus Speed was caught
participating in a number of drug transactions in-
volving the sale of a total of 74.2 grams of crack cocaine.
This led to his conviction on three felony charges: con-
spiracy to distribute more than 50 grams of cocaine
base, distribution of more than 50 grams of cocaine base,
and possession of more than five grams of cocaine

base with intent to distribute. See 21 U.S.C. §§ 841(a)(1), 846. Because he had two prior state felony drug convictions, he received a mandatory sentence of life imprisonment without the possibility of parole. He now appeals, claiming that his convictions were supported by insufficient evidence. He also urges that we should find that the Fair Sentencing Act of 2010, passed after his sentencing, applies retroactively, and thus permit him to be re-sentenced under that law's more lenient standards. Finally, he argues that his mandatory life imprisonment sentence violates the Fifth and Eighth Amendments to the Constitution. He has not, however, demonstrated that no jury could have found him guilty, and so his first argument cannot succeed. His latter two arguments, while preserved for further review, are both foreclosed by established law in this circuit. We therefore affirm.

## I

Special Agent Gary Tison was an undercover agent working for the Kankakee Area Metropolitan Enforcement Group (KAMEG), a multijurisdictional drug enforcement task force. On August 20, 2008, Agent Tison arranged to buy crack cocaine from Anthony Cunningham, Jr. Cunningham testified that his supplier was Speed; Speed fronted Cunningham the drugs and allowed Cunningham to pay him back after the sale. The sale to Tison went off without a hitch: Tison bought 4.5 grams of crack cocaine for $400, and Cunningham dutifully paid Speed his share. Before parting, Tison

and Cunningham spoke about the possibility of Tison's supplying Cunningham with marijuana.

A few weeks later, on September 12, Tison arranged another buy. Speed again fronted Cunningham the drugs and this time drove Cunningham to the agreed-upon meeting place, a Kankakee gas station. Cunningham got into Tison's car to carry out the deal, but he expressed worries about police activity near the gas station. At Cunningham's direction, Tison followed the car Speed was driving to a nearby street. There Tison bought 8.8 grams of crack for $600. The two then set up a third deal for 63 grams of crack, and Tison informed Cunningham that he had found a marijuana supplier. Cunningham got back into Speed's car and paid him for the crack.

On September 23, Tison met Cunningham to buy the 63-odd grams of crack. Speed fronted Cunningham the crack and again accompanied Cunningham to the familiar gas station. Cunningham got into Tison's car and exchanged 60.9 grams of crack cocaine for $2,250. They then discussed a future marijuana-for-crack exchange. Cunningham met back with Speed and promptly paid him for the crack.

On October 10, Tison and Cunningham arranged yet another deal. The plan was that Tison would sell Cunningham ten pounds of marijuana for $7,000 and trade an additional two pounds of marijuana for 40 grams of crack cocaine. KAMEG Special Agent Clayt Wolfe accompanied Tison as the purported marijuana supplier. The four met this time in a shopping mall parking

lot. In contrast to the previous transactions, Speed played a more active role during this episode. Though Tison had not formally met Speed, he recognized him as the driver in the two September transactions. The deal did not go smoothly. An argument erupted about the exchange procedure: Wolfe wanted to see the money first, while Cunningham demanded to see the product. Speed interjected to smooth things over. The bickering continued, however, and Wolfe expressed his intention to leave. Tison then suggested that Wolfe and Speed talk alone and settle the deal.

Speed and Wolfe stepped aside and began debating whether money or product should be shown first. Unfortunately for Speed, his words were being recorded secretly, and so the more he spoke, the deeper he dug himself into a hole. In order to demonstrate his trustworthiness to Wolfe, he explained that Tison had bought drugs from him "all the time." He mentioned that Tison bought 63 grams from him recently. Speed then went on to say that he "was the man, [he was] the one who want[ed]" the marijuana. The two then rejoined the group and reached an agreement: Speed and Cunningham would leave and return with the money. A little later, Cunningham came back alone and reported that Speed decided against the deal—he would give no money until he saw the goods.

The foursome tried again on November 13 at a Kankakee hotel. This time, the conversation (again recorded) was fairly disjointed. Speed started the bidding at three pounds of marijuana for 60 grams of cocaine. Without

addressing the offer, Wolfe then asked how much crack Speed could deliver. Speed boasted that he could produce "[w]hatever much you trying to get," and stated that his price was $1,800 for 63 grams. After more discussion, the stalemate that had stalled the earlier negotiations ended: Wolfe and Tison took Cunningham to their car to inspect the marijuana. They settled on Wolfe's selling seven pounds of marijuana for $4,400 and trading three pounds for 63 grams of crack. To Tison's and Wolfe's frustration, Speed and Cunningham had not brought enough money. Speed still wanted to make the crack-for-marijuana swap, but his time had run out. Wolfe signaled to the other officers and Speed and Cunningham were arrested. When arrested, Speed was carrying a bag containing 16.4 grams of cocaine base.

The grand jury indicted Speed on three counts: Count 1 charged him with conspiracy to distribute more than 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii) and 846, based on all of the drug transactions from August 20 to November 13; Count 2 charged him with distribution of more than 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii), for the September 23 sale of 60.9 grams of cocaine; and Count 3 charged him with possession with intent to distribute of more than five grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii), based on the 16.4 grams of cocaine base he possessed on November 13.

At trial, Cunningham, Tison, and Wolfe testified consistently with the facts we have laid out. Speed had a dif-

ferent story to tell. He contended that he had no involve-
ment in the August and September transactions. Con-
tradicting Cunningham's testimony, Speed denied pro-
viding Cunningham with the crack for those sales. More-
over, contrary to both Cunningham's and Tison's testi-
mony, he denied driving Cunningham on September 12.
As for September 23, Speed said he arrived at the gas
station only to buy cigarettes and soda pop. In an
odd attempt to deflect the drug charges, Speed testified
that on November 13 he intended to rob Wolfe and Tison,
not to deal drugs. This testimony conflicted with his
post-arrest interview, in which he stated that he
intended to dupe Wolfe and Tison by trading them a
measly 12 grams of crack—and not 63 grams—for the
three pounds of marijuana.

The jury was unpersuaded by Speed's testimony and
convicted him on all counts. Because Speed's sales in-
volved a total of over 50 grams of crack cocaine and he
had two prior state felony drug convictions, the version
of 21 U.S.C. § 841(b)(1)(A)(iii) in effect at the time of
his sentencing mandated that he receive a life sentence
on Counts 1 and 2. The district court sentenced him
to three concurrent terms of life imprisonment. This
included a life term for Count 3 for which this sen-
tence was not required. This appeal followed.


## II

### A

We first consider Speed's argument that the evidence
is insufficient to support his conspiracy and distribution

convictions on Counts 1 and 2. In making this argument, Speed faces a daunting standard of review: We review challenges to the sufficiency of the evidence *de novo*, "consider[ing] the evidence in light most favorable to the government, drawing all reasonable inferences in its favor." *United States v. Aldridge*, 642 F.3d 537, 544 (7th Cir. 2011). "As long as a rational trier of fact could have returned a guilty verdict, the verdict will be affirmed." *Id.*

To prove a conspiracy to distribute charge, the government must show that there was an agreement between two or more persons to distribute cocaine, and that the defendant knowingly and intentionally entered into this agreement. *United States v. Suggs*, 374 F.3d 508, 518 (7th Cir. 2004). The agreement must go beyond the sale of drugs between the putative co-conspirators; not every sale of drugs is itself a conspiracy to distribute. As we said in *United States v. Lechuga,* 994 F.2d 346 (7th Cir. 1993) (*en banc*), "[w]hat is necessary and sufficient [to prove conspiracy] is proof of an agreement to commit a crime other than the crime that consists of the sale itself." *Id.* at 347. The government must demonstrate an understanding—explicit or implicit—among co-conspirators to work together to distribute drugs to third parties. *Suggs*, 374 F.3d at 518. To prove a distribution charge, the government needs to show that the defendant knowingly and intentionally distributed crack cocaine, with the knowledge that he was distributing a controlled substance. *United States v. Hatchett*, 245 F.3d 625, 631 (7th Cir. 2001). Speed argues that there was not enough evidence to demonstrate he was involved in

the transactions between Cunningham and Tison on August 20, September 12, and September 23. On that premise, he reasons that the government can show neither that Speed and Cunningham had an agreement as required for the conspiracy count, nor that Speed distributed any crack as required for the distribution count.

Speed notes that the government relied heavily on two pieces of evidence: first, Cunningham's testimony that Speed was involved in the transactions, and second, Speed's own statements recorded during the October 10 transaction. Cunningham testified that he and Speed had a standing arrangement: Cunningham would receive crack from Speed on credit immediately before a sale, make the sale, and then pay Speed back immediately afterwards. Speed, he said, trusted Cunningham to pay him back because of their ongoing relationship. Furthermore, Cunningham testified that Speed accompanied him to meet Tison for the sales on September 12 and 23. The government contends that the jury could have inferred from Cunningham's testimony that the two had an agreement to distribute crack and that Speed was an active participant in the distribution.

Still worse for Speed were his own statements. At the October 10 meeting, when Speed and Wolfe were negotiating the trade of marijuana for crack and cash, Speed tried to persuade Wolfe to complete the deal by appealing to the fact that Tison had recently bought crack from Speed. Speed said, "Your man, your man, your man, he's come and buy stuff from me. He come by

all the time, all the tee- or whatever from me. . . . Last time, he just came and bought a sixty-three." The government contends that this statement is an admission by Speed that he was directing Cunningham's sales of crack to Tison. Moreover, it refers particularly to the September 23 transaction where Tison bought 60.9 grams of crack cocaine from Cunningham (and Speed).

Speed's only response is that all of this evidence was unreliable, because it was uncorroborated and Cunningham was lying to get a lighter sentence. His own statements on October 10, he adds, were mere puffery. In contrast, Speed notes that on November 13 he stated that he had no middlemen in his drug deals. Finally, Speed argues that even if Cunningham's testimony were taken to be true, that would establish nothing more than a buyer-seller relationship, not a conspiracy to distribute crack cocaine.

Speed's criticism of Cunningham's testimony falls flat, as "[w]e will not upset the jury's credibility determination unless . . . it was 'physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all.'" *United States v. Johnson*, 437 F.3d 665, 675 (7th Cir. 2006) (internal citations omitted). In fact, Cunningham's testimony was perfectly plausible. Tison corroborated that Speed drove Cunningham on September 12, even though Speed vehemently denies having done so. Moreover, Speed himself recognizes that his own statements were contradictory. (We have no need to review them one by one; it was the jury's task to

decide which to credit and which to reject, and its verdict reveals its conclusions.) Faced with the choice between Cunningham's and Speed's versions, we think a reasonable jury could have believed Cunningham.

Finally, we consider Speed's argument that this all shows nothing more than the existence of a buyer-seller relationship. This argument, we note, affects only Count 1. Speed argues that Cunningham's testimony established only that Speed sold Cunningham crack cocaine, not that they agreed to distribute to anyone else. But this sells Cunningham's testimony short. Cunningham testified that he and Speed had a routine practice before a sale: Speed would front Cunningham drugs, Cunningham would sell them, and without fail Cunningham would pay Speed back immediately after. Speed would sometimes even drive Cunningham to the sale, as he did on September 12 and 23. The fact that Speed himself stated that Tison bought drugs from him, through Cunningham, also shows this to be more than a simple buyer-seller relationship between Speed and Cunningham. The jury was entitled to conclude that the two were working together to make sales to a broader clientele: Speed's job was to provide the crack and, often, the transportation, while Cunningham's job was to pass the product along to the customer and receive the payment. Drawing all the inferences in the government's favor, as we must, we conclude that the evidence permitted the jury to find that Speed and Cunningham knowingly and intentionally agreed to work together to distribute crack cocaine to Tison. Thus, we find the evidence sufficient on both of the counts he challenges.

B

Speed also attacks his sentence on several grounds. On March 3, 2010, he was sentenced to mandatory life imprisonment without the possibility of parole based on the penalties set forth in 21 U.S.C. § 841(b)(1)(A)(iii) and the jury's findings that he conspired to distribute and distributed more than 50 grams of cocaine base. Because Speed had two prior state felony drug convictions, the statute in effect at the time he committed his crimes mandated that he receive a life sentence. On August 3, 2010, while Speed's appeal was pending, Congress passed the Fair Sentencing Act of 2010 (FSA), Pub.L. No. 111-220, 124 Stat. 2372, amending § 841. With the passage of the FSA, Congress raised the amount that triggers the mandatory life sentence from 50 grams to 280 grams. The amounts involved in Speed's two offenses were 74.2 grams (conspiracy) and 60.9 grams (distribution), and so under the FSA, Speed would escape this harsh sentence. Indeed, under the FSA, Speed would be subject to only a 10-year mandatory sentence. The difference is indeed stark, and so it is understandable that Speed argues that the FSA should apply to his case. He also argues that his sentence was imposed in violation of the Fifth and Eighth Amendments to the Constitution. We consider these arguments in turn.

First, Speed argues that Congress intended for the FSA to apply retroactively to all cases that were not fully resolved as of the effective date of the Act. All we can do, however, is acknowledge that Speed has properly preserved this argument for possible further review

in the Supreme Court. We definitively rejected this position in our recent decisions in *United States v. Bell*, 624 F.3d 803 (7th Cir. 2010), and *United States v. Fisher*, 635 F.3d 336 (7th Cir. 2011). Our rationale was that the general federal saving statute, 1 U.S.C. § 109, applies to the FSA and prevents it from operating retroactively. *Bell*, 624 F.3d at 815; *Fisher*, 635 F.3d at 338.

Speed's constitutional arguments, though skillfully presented, fare no better. Speed first contends that his mandatory life sentence violates the Equal Protection Clause of the Fourteenth Amendment, as reflected in the Fifth Amendment. *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 542 n.21 (1987) (noting that the Fifth Amendment has an equal protection component precisely the same as the equal protection of the Fourteenth Amendment). Speed makes the incontestable point that refusing to apply the FSA to defendants sentenced shortly before the passage of the FSA results in radically different sentences between them and those who are entitled to have the FSA apply to them. He contends that this is an utterly arbitrary outcome—so bad as to violate the Fifth Amendment.

Because no fundamental right or suspect classification is at issue, we review his claim under the rational-basis standard of review. *Smith v. City of Chicago*, 457 F.3d 643, 650 (7th Cir. 2006). Under this standard, he must show that there is no "rational relationship between the disparity of treatment and *some* legitimate governmental purpose." *United States v. Nagel*, 559 F.3d 756,

760 (7th Cir. 2009). But the disparate treatment to which Speed points is plainly rational, as "discrepancies among persons who committed similar crimes are inescapable whenever Congress raises or lowers the penalties for an offense." *United States v. Goncalves*, 642 F.3d 245, 253 (1st Cir. 2011). Someone, in the end, will always be left behind to live with the earlier, harsher penalty, whenever Congress chooses to amend a sentencing statute. Whatever arbitrariness there may be is therefore unavoidable.

Finally, Speed argues that the imposition of a mandatory life sentence for his crime constitutes "cruel and unusual punishment" in violation of the Eighth Amendment. U.S. CONST. amend. VIII. The Supreme Court has written that "[t]he [Eighth] Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency'" and thus penalties must be gauged in light of "'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (internal citations omitted). We have previously held that the mandatory life sentence imposed under 21 U.S.C. § 841(b) does not run afoul of the Eighth Amendment. *E.g.*, *United States v. Strahan*, 565 F.3d 1047, 1052-53 (7th Cir. 2009). Speed pleads that the enactment of the FSA shows that society's "standards of decency" have evolved such that his mandatory life sentence for such a small amount of crack (less than a five-pound bag of flour), imposed under the old statutory scheme, is now cruel and unusual. Such a conclusion, however, is foreclosed by the Supreme Court's decisions in this area. In *Ewing v. Cali-*

*fornia*, 538 U.S. 11, 25 (2003), the Court upheld California's three-strikes law, and similar statutory regimes continue to abound today. See, *e.g.*, CAL. PENAL CODE § 667; IND. CODE § 35-50-2-8.5; WIS. STAT. § 939.62 (all displaying three-strikes regimes that include offenses involving drugs). Congress's amendment to the statutory penalties does not transform the preexisting penalty scheme into a cruel and unusual one. (Such a finding might have the undesirable effect of deterring Congress from enacting laws similar to the FSA if and when it concludes that an existing penalty is too severe.) We conclude that Speed's mandatory life sentence based on the quantity of drugs for which he was responsible and his recidivism is not grossly disproportionate and thus does not run afoul of the Eighth Amendment.

*    *    *

We therefore AFFIRM the judgment of the district court.