# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2519

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * Appeal from the United States |
| v. | * District Court for the Southern |
| | * District of Iowa. |
| Rodger Lee Moran, | * |
| | * |
| Defendant - Appellant. | * |

_____

Submitted: January 14, 2010
Filed: July 14, 2010

_____

Before LOKEN,[1] Chief Judge, JOHN R. GIBSON, and WOLLMAN, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Rodger Lee Moran was convicted by a jury of conspiracy to distribute at least fifty grams of actual methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(viii), and sentenced to life imprisonment. Moran brings this appeal, arguing that (1) the evidence was insufficient to support his conviction; (2) the district

_____

[1]The Honorable James B. Loken stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2010. He has been succeeded by the Honorable William Jay Riley.

court[2] erred in concluding that sentencing manipulation did not occur; and (3) his sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment. We affirm.

## I.

In June 2006, Special Agent John Douglas Hurley of the Iowa Division of Narcotics Enforcement was part of an investigation concerning methamphetamine production in Mystic, Iowa. On June 22, Agent Hurley identified a possible supplier by the name of Sarah Rhiner. Task Force Officer Jeff Koder, acting undercover, engaged Rhiner in several telephone conversations in an effort to purchase methamphetamine. As a result, Koder was able to arrange a meeting with Rhiner to purchase one-quarter of an ounce of methamphetamine. Rhiner then delivered a quantity of purported methamphetamine to Koder at a car wash in Knoxville, Iowa for $600. The two also agreed to conduct additional methamphetamine transactions. Following the purchase, Agent Hurley performed two field tests on the substance, neither of which indicated the presence of methamphetamine.

On the afternoon of June 28, Officer Koder received a telephone call from an individual named Rodger, which investigators recorded. Rodger instructed Koder to meet with Rhiner, Rodger's then-girlfriend, at a gas station in Des Moines to purchase methamphetamine. Koder told Rodger that he had not been able to contact Rhiner. Rodger responded that Rhiner would answer Koder's call when Rodger told her to answer.

Several minutes later, Koder received a telephone call from Rhiner. Rhiner stated that "[h]e wanted me to call you." Koder confirmed that Rhiner was referring

---

[2]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

to Rodger. Rhiner said that Rodger was getting ready and that Koder should prepare to come to Des Moines. Rhiner told Koder that Rodger said it might be a little while before he was ready to conduct the transaction, but Rhiner assured Koder it would not be long. Rhiner stated that she would wait for Rodger's call before meeting Koder in Des Moines. Around twenty minutes later, Rodger called Koder. During the conversation, Rodger informed Koder that he could supply him three quarters of an ounce of methamphetamine for $1,200 and he encouraged Koder to come to Des Moines. Koder agreed, and the two confirmed that the exchange would take place at the gas station they had discussed earlier. Both of these conversations were also recorded.

Later that evening, Koder purchased 10.4 grams of actual methamphetamine for $1,200 from Rhiner at the arranged location. After the exchange, Rhiner told Koder she needed to go meet with her "old man." A few minutes later, Koder received an un-recorded telephone call from Rodger. Rodger asked if Koder was pleased with the amount of methamphetamine that Koder had received. Koder inquired about future transactions, and Rodger replied that the price should come down as Koder purchased more methamphetamine.

Around noon on July 13, Koder made a recorded telephone call to Rhiner. During the conversation, Rhiner said that she would have Rodger call Koder after she picked Rodger up at 5:15 p.m. Rhiner also explained that she did not know if she would be able to come to Knoxville to sell methamphetamine to Koder. The next day, Koder placed another recorded call to Rhiner. During this call, Rhiner stated that Rodger was attempting to get methamphetamine for a better price from other sources, but Rodger wanted to know whether Koder could travel to Des Moines to purchase it. Rhiner said she would have Rodger call Koder after she spoke with him "because [Rodger] knows what's going on . . . [h]e never tells me shit." Rhiner also offered to check with other methamphetamine sources herself before calling Koder back. Later that afternoon, Koder received a telephone call from Rhiner in which she agreed to

sell Koder an ounce of methamphetamine for $1,450. They agreed to meet at the same Des Moines gas station where the last transaction had occurred.

At approximately 4:00 p.m. that day, Koder met with Rhiner at the gas station. Koder told Rhiner that he only had $1,400, and Rhiner agreed to loan Koder the other fifty dollars. Koder then made a controlled buy of 10.4 grams of actual methamphetamine for $1,400 from Rhiner. During the transaction, Rhiner informed Koder that she would be able to supply him with two ounces of methamphetamine for approximately $2,600.

Late on July 17, 2006, Officer Koder received a recorded telephone message from Rodger asking Koder to call him. The next morning, Koder placed a recorded telephone call to Rodger. During the call, Rodger asked Koder when he would be coming to Des Moines. Koder said that he would have the money by Thursday and asked Rodger what was available for sale. Rodger said he would sell "three [three ounces of methamphetamine] for four [$4,000]." Koder offered to pay Rhiner $100 to deliver the four ounces to him in Knoxville. Rodger said that Rhiner could not do that because her car was unreliable and he agreed to get back to Koder later. Later that day, Koder placed another recorded call to Rodger during which Rodger confirmed that Rhiner did not have a way to get to Knoxville. In response, Koder offered to pay a higher price for one ounce of methamphetamine if Rhiner would deliver a total of four ounces of methamphetamine to him in Knoxville. Rodger again stated that Rhiner could not travel to Knoxville but asked if Koder wanted "three [three ounces] for four [$4,000] and . . . one [one ounce] for fifteen [$1,500]." Koder and Rodger agreed to work on the transportation problem.

On July 19, Koder made a recorded telephone call to Rhiner, and Rhiner reiterated that she could not deliver the methamphetamine to Knoxville. She said that Rodger had just left work and that she had both phones with her. Rhiner confirmed that she could do a four ounce methamphetamine sale to Koder and agreed to let

-4-

Rodger know to leave Koder a message on his phone so that Koder would "know what's going on." Later that day, Rhiner called Koder and said that she could bring the methamphetamine to Knoxville the next day, but the transaction never occurred. On the morning July 22, Koder received a recorded telephone message from Rodger asking Koder to call him. Koder returned Rodger's call, but the call was not recorded. Koder asked why no one had called to do the July 20th transaction. Rodger did not really explain but stated that he had instructed Rhiner to call Koder. Rodger said that he could still do the deal if Koder could make the purchase in Des Moines. Koder said that he was having his own problems with transportation and offered to pay Rhiner to bring the methamphetamine to Knoxville. Rodger stated that he had a friend who might allow his girlfriend to bring Rhiner to Knoxville to deliver the methamphetamine.

On July 24, Koder received a recorded telephone message from Rodger asking that Koder call him. Koder spoke with Rodger that night, in a recorded telephone conversation. Rodger told Koder that his source would not allow the methamphetamine to leave Des Moines without payment, but said he could do the transaction in Des Moines. Koder said he would try to find a way to travel to Des Moines. During this conversation, Rhiner's voice could be heard in the background. Koder made another recorded call to Rodger and explained that he could travel to Des Moines. Rodger instructed Koder to call Rhiner because Rodger was at work.

Following Rodger's instructions, Koder had several recorded telephone conversations with Rhiner in an attempt to set up the four-ounce transaction. On July 25, Koder received a recorded telephone call from Rhiner. Rhiner told Koder that she found transportation and now could come to Knoxville. She also explained that she would have to do the deal quickly because she needed to be in Des Moines by 10:45 p.m. to pick up her "old man." Shortly after 10:00 p.m. that night, Koder made a controlled purchase of 39.74 grams of actual methamphetamine from Rhiner at a car wash in Knoxville, Iowa. Rhiner was arrested immediately after the transaction.

Following Rhiner's arrest, Koder received a telephone call from a private number, and Koder immediately hung up after answering. Almost instantly, Koder received a recorded phone message from Rodger stating "dude, why did you hang up the phone on me? I'm going to have a problem with that. Answer the phone when I call." Shortly thereafter, Koder received another incoming call and a numeric page. Less then ten minutes later, Koder received a recorded telephone message from Rodger, who was calling from another number. Rodger demanded Koder call him back or "I'm just going to have to send some dudes down to there to look for you." Rodger stated that "you need to call . . .. Do you understand that? It's a small town. I will find you."

During the course of the investigation, officers came to believe that the individual named Rodger with whom Koder communicated was Rodger Moran. After Rhiner was arrested, investigators attempted to question her concerning Moran's involvement in the methamphetamine transactions. Although she initially refused to implicate Moran, Rhiner eventually confirmed that "Rodger" from the tapes was in fact Rodger Moran. Moran was arrested and indicted on one count of conspiracy to distribute at least fifty grams of actual methamphetamine and one count of distribution of at least five grams of methamphetamine. The government dismissed the latter count, and Moran proceeded to a jury trial on the conspiracy charge.

During Moran's trial, in addition to testimony from the officers involved, the government introduced audio tapes of the telephone conversations between Koder and Rhiner and between Koder and Rodger. Rhiner, who testified pursuant to a cooperation plea agreement, stated that the voice on the tapes of the man known as Rodger was that of the defendant, Rodger Moran. Rhiner explained that she was romantically involved with Moran during the summer of 2006. According to Rhiner, Moran was living at the Fort Des Moines correctional institution at the time, but he was allowed to leave the half-way house for work purposes. Rhiner testified that she drove Moran to and from work at the Bar-B Repair Shop that summer.

Rhiner testified that around June 2006, Moran introduced her to Jimmy Brandt for the purpose of obtaining methamphetamine for resale. She explained to the jury that, while she believed that she had previously seen Brandt, she had never met or spoken to him before Moran introduced her. Rhiner testified that shortly thereafter, Brandt began to supply her with methamphetamine "on a front." Rhiner explained that "on a front" meant that Brandt gave her a quantity of methamphetamine and that she would then resell the methamphetamine and pay Brandt.

During her testimony, Rhiner admitted to selling methamphetamine to Officer Koder and explained that Brandt supplied her with the methamphetamine for the four ounce controlled buy. She testified that Moran was aware of her involvement with Koder and that Moran was in telephone contact with Koder "to set up deals and get rid of methamphetamine." She also testified that Moran directed her in the delivery of methamphetamine to Koder on several occasions, including directing her to obtain methamphetamine from a different supplier. Rhiner testified that one of the numbers she would use to contact Brandt was the number from which Koder had received the numeric page. Rhiner also testified that on the day of her arrest, Raeanna Paxton drove her to Knoxville to deliver four ounces of methamphetamine to Koder. Rhiner had hoped to be back in Des Moines to take Moran to work. When it became clear that she would not be back in time, Rhiner asked Brandt to pick up Moran and take him to work.

The government also produced testimony from James Lawrence Brandt, who testified pursuant to a cooperation plea agreement with the government. Brandt testified that he had been incarcerated with Moran and Shannon Paxton during the spring of 2006. Brandt described discussions that he had with Moran in which the two agreed to deal methamphetamine together when they got out of prison. After Brandt was released from prison, he was contacted by Moran, who was incarcerated at the Fort Des Moines half-way house. Moran asked Brandt to provide Rhiner with quantities of methamphetamine for resale, explaining that they needed to make some

money.  Brandt did not know Rhiner before Moran introduced her.  Brandt supplied Rhiner with one-quarter ounce, one-half ounce, and one ounce quantities of methamphetamine.  Rhiner then paid Brandt for the methamphetamine after she sold it.

Brandt testified that in July 2006, he agreed to supply Rhiner with four ounces of methamphetamine.  He explained that he delivered the methamphetamine to Rhiner through a third party, Raeanna Paxton.  Brandt testified that later that night, Rhiner called and asked him to pick up Moran at the half-way house and take him to work, and Brandt agreed.  Brandt and his girlfriend, Erica Boden, picked up Moran, and Moran became concerned that Rhiner had traveled to Knoxville to deliver the methamphetamine.  Moran then used Brandt's cell phone and Boden's cell phone to try to track down Rhiner.  Brandt testified that Boden's cell phone number was one from which Moran had called Koder.

At the close of evidence, Moran moved for a judgment of acquittal.  The district court denied the  motion, and the jury found Moran guilty of conspiracy to distribute at least fifty grams or more of actual methamphetamine.  Because of his previous felony drug convictions, Moran was sentenced to life imprisonment.  This appeal followed.

## II.

Moran appeals, first arguing that there was insufficient evidence to support his conviction.  "This court reviews the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict."  United States v. Santana, 524 F.3d 851, 853 (8th Cir. 2008) (internal quotation marks omitted).  We will reverse only if no reasonable jury could have found Moran guilty beyond a reasonable doubt.  Id.

To support a conviction for conspiracy to distribute methamphetamine under 21 U.S.C. §§ 841(a) and 846, the government must prove beyond a reasonable doubt that (1) a conspiracy to distribute methamphetamine existed; (2) Moran knew about the conspiracy; and (3) Moran knowingly became a part of the conspiracy. See United States v. Vinton, 429 F.3d 811, 815 (8th Cir. 2005). In addition, the government must demonstrate that the conspiracy involved the purported drug quantity, in this case at least fifty grams of actual methamphetamine. See id.

Our review of the record reveals that the government met its burden. The government introduced the testimony of Sarah Rhiner and James Brandt, both of whom testified that there was an agreement between themselves and Moran to distribute methamphetamine. Rhiner specifically testified that Moran was aware of, and voluntarily agreed to participate in, the distribution of methamphetamine to Koder. The government also produced the recorded tape conversations between Koder and Rhiner and between Koder and Moran. The government linked the tapes to Moran through the testimony of Rhiner, who was herself audibly present during at least one of the recorded conversations between Moran and Koder. Rhiner testified about Moran's role in the distribution, including the amounts involved. Brandt also testified that he and Moran made an agreement while in prison to work together to distribute methamphetamine. The government produced testimony from Officer Koder concerning his conversations with Moran and Rhiner and the controlled purchases of methamphetamine that he made from Rhiner. Finally, the government produced evidence that the substances that Officer Koder purchased from Rhiner, Moran's co-conspirator, exceeded fifty grams of actual methamphetamine.

Nonetheless, Moran argues that his conviction should be reversed because the testimony of Rhiner and Brandt lacked credibility and contained inconsistencies. However, "[i]t is for the jury to resolve conflicts in testimony and make credibility determinations, and those determinations are virtually unreviewable on appeal." United States v. Trogdon, 575 F.3d 762, 767 (8th Cir. 2009) (internal quotation marks

omitted), cert. denied, 78 U.S.L.W. 3394 (U.S. Jan. 11, 2010) (No. 09-7983). In addition, the government's other evidence supported Brandt's and Rhiner's testimony. Accordingly, the government produced sufficient evidence to support Moran's conviction.

## III.

Next, Moran argues that the district court erred by refusing to grant a downward departure or variance because the government engaged in sentencing manipulation. In this context, we review the district court's factual findings for clear error and its legal conclusions de novo. See United States v. Torres, 563 F.3d 731, 734 (8th Cir. 2009).

"Sentencing manipulation occurs when the government unfairly exaggerates the defendant's sentencing range by engaging in a longer-than-needed investigation and, thus, increasing the drug quantities for which the defendant is responsible." Id. Where sentencing manipulation occurs, the court "should grant a downward departure to the Guidelines range it believes would apply absent the manipulation." Id. To warrant a departure, the defendant must demonstrate by a preponderance of the evidence "that the officers engaged in the later drug transactions solely to enhance his potential sentence." Id. (quoting United States v. Berber, 161 F.3d 531, 532 (8th Cir. 1998).

Moran argues that sentencing manipulation was present because "it was the government, not the [d]efendant or Sarah Rhiner, that drove the amount of the transactions." In support of this argument, Moran points to evidence that the amounts of drugs that the government informant requested increased over time. Moran also claims that the drug quantity requested increased soon after an investigator learned that he had two previous felony drug convictions.

In response, the government points to the sentencing hearing testimony of the case agent in charge, Agent John Douglas Hurley. Agent Hurley testified that "[t]he ultimate goal of the investigation was to take down the source of supply . . . to identify more people involved in the delivery of narcotics as well as take more narcotics off the street." Agent Hurley explained why the "bust" transaction involved a larger quantity of drugs and was arranged to take place outside of the Des Moines area:

> Ultimately we wanted to draw Ms. Rhiner out of the Des Moines area into the Knoxville, Iowa, area where we could purchase a quantity of three to four ounces of methamphetamine ice where she would have to go back to Des Moines, ultimately roll on her source of supply and to gain more information, more intelligence information, pay off her source of supply and try to obtain more narcotics and take more narcotics off the street.
> . . .
> [Knoxville is] a safer environment. We're in control of the situation. We knew entrances and exit points of where we wanted the transaction to occur for safety purposes.
> . . .
> [W]e knew that [Rhiner] was going to be bringing a quantity of narcotics that was probably in excess of money that she would have on hand where she would have to go back and pay her source of supply. . . . We want her now to give us her source of supply, take us to the person that she received the drugs from, introduce one of us to her source of supply and let us pay off her drugs and receive more information or more drugs in return.

When questioned as to why the purchase amounts increased over time, Agent Hurley explained that:

> It's a common thing that we do is start off with small quantities for the fact if you come in there and you want to purchase four ounces from the very beginning, people are going to think you're a law enforcement officer. We want to gain the rapport with them. We want to gain a little bit of respect from them where they think that we have the money and

we can come through with the transaction, and we want to ultimately befriend them and to make things better in the long run.

Finally, Agent Hurley testified that he "had no idea at the time [that when he instructed Officer Koder to ask for four ounces instead of three] that [Moran] was looking at a life sentence based upon the purity level or the quantity."

This court has made it clear that police are permitted to engage in "a legitimate pattern of increasing amounts of drugs in order to determine what quantity of drugs a defendant will deal" and "to establish that person's guilt beyond a reasonable doubt." Id. (internal quotation marks omitted). We have also explained that police are permitted to engage in transactions of increasing amounts in an effort to "probe the depth and extent of [the] criminal enterprise, to determine whether coconspirators exist, and to trace the drug deeper into the distribution hierarchy." Id. (quoting United States v. Shephard, 4 F.3d 647, 649 (8th Cir. 1993)). Our review of the record reveals that the investigators in this case did precisely that. Moreover, even if the detectives were aware of Moran's earlier felony convictions, this awareness does not require that they cease their investigation. The officers were entitled to pursue their legitimate investigatory goals, and the record reveals no evidence that the officer's engaged in the higher drug quantity transactions "solely to enhance [Moran's] sentence." Id. Accordingly, there was no sentencing manipulation, and the district court did not err in refusing to grant a departure on that basis.

IV.

Finally, Moran argues that his mandatory sentence of life imprisonment violates the Eighth Amendment's prohibition on cruel and unusual punishment. This argument, however, has been consistently rejected by our court. See United States v. Whiting, 528 F.3d 595, 596-97 (8th Cir. 2008) (holding that mandatory life imprisonment for defendant convicted of conspiracy to distribute and possession with

intent to distribute cocaine did not violate the Eighth Amendment where defendant had two prior drug felonies, citing numerous Eighth Circuit opinions upholding mandatory life sentences in career offender drug cases).

V.

For the forgoing reasons, the judgment of the district court is affirmed.

_____