# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3708
_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Arturo Padilla Garcia, | * |
| | * |
| Appellant. | * |
| | * |

_____

No. 10-3794

_____

Appeals from the United States
District Court for the
District of Minnesota.

| | |
|---|---|
| | * |
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Edvin Emanuel Gomez Maldonado, | * |
| | * |
| Appellant. | * |

_____

Submitted: June 14, 2011
Filed: July 22, 2011

_____

Before LOKEN, BEAM, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

A jury found Arturo Garcia and Edvin Maldonado guilty of conspiracy to distribute methamphetamine and multiple counts of distribution of methamphetamine. The district court[1] sentenced Garcia to 121 months' imprisonment and Maldonado to 80 months' imprisonment. Both Garcia and Maldonado now appeal their convictions. For the reasons that follow, we affirm.

## I.    BACKGROUND

In November 2009, the Minneapolis Police Department began investigating Garcia on suspicion that he was distributing methamphetamine. On November 24, a confidential informant named Francisco Morales set up a meeting with Garcia in the parking lot of a restaurant in Minneapolis. Three members of the Minneapolis Police Department surveilled the November 24 meeting: Sergeant Grant Snyder, Sergeant Matthew Wente, and Officer Bart Hauge. Garcia arrived in a Dodge Dakota and met with Morales in Morales's vehicle for several minutes. A recording device worn by Morales captured their conversation, which involved a discussion in Spanish of drug sources, costs, and purity. During the meeting, Garcia gave Morales a sample that later tested positive for methamphetamine. After the meeting concluded, Garcia got back into the Dodge Dakota and drove away from the scene. The officers followed the Dakota to Garcia's apartment building in southern Minneapolis, where Maldonado also resided, and Garcia and two other individuals left the vehicle and entered the building. After a short time, they exited the building and drove off in the Dodge

_____

[1] The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

-2-

Dakota. The officers followed the vehicle again, eventually stopping it and identifying Garcia as one of the occupants.

On December 2, Morales arranged a controlled drug buy with Garcia at the apartment building in Minneapolis in which he and Maldonado resided. Sergeant Snyder, Sergeant Wente, and Officer Hauge conducted surveillance of the transaction. Garcia exited the apartment and entered Morales's vehicle, where he remained for about two minutes. During this exchange, Garcia gave Morales a package that was later tested and found to contain 25.3 grams of methamphetamine. Garcia and two other individuals then drove to a restaurant in St. Paul, Minnesota, in the same Dodge Dakota that the officers had encountered on November 24, where they met in the parking lot with the occupants of a vehicle registered to an individual named Manuel Rodriguez.

Rodriguez also was under suspicion of distributing methamphetamine and was under investigation by the Drug Enforcement Administration ("DEA"). On December 10, DEA Special Agent Christopher Hage arranged a controlled buy between Rodriguez and a confidential informant named Eduardo Urbina in the parking lot of a Taco Bell in St. Paul. Special Agent Hage and Officer Kenneth Sass, a member of the Minneapolis police department who was assigned to the DEA task force, surveilled the transaction. Rodriguez arrived in his Ford pickup truck, and Garcia was present in the Dodge Dakota, accompanied by Maldonado. Rodriguez approached the Dakota and was given a package. He then walked over to Urbina and sold him the package, which later was tested and found to contain 34.2 grams of methamphetamine.

Special Agent Hage arranged a second controlled buy for later that same day, to occur in the parking lot of a K-Mart store in St. Paul. Once again, Rodriguez arrived at the parking lot in his Ford pickup, received a package from the Dodge

Dakota occupied by Garcia and Maldonado, and sold it to Urbina. The package was tested and found to contain 9.6 grams of methamphetamine.

After the transaction was complete, the officers followed the Dakota away from the K-Mart and instructed officers in a marked Minneapolis police car to conduct an investigative stop of the Dakota. Two of the three occupants identified themselves as Garcia and Maldonado. At the officers' request, they also provided their addresses and cell phone numbers. Rodriguez's subsequently obtained cell phone records revealed 279 calls between Rodriguez and Maldonado from November 27 to December 22.

A federal grand jury returned a superseding indictment charging Garcia, Maldonado, and Rodriguez with one count of conspiracy to distribute fifty grams or more of methamphetamine, a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846, Garcia with three counts of distribution of methamphetamine, and Maldonado and Rodriguez each with two counts of distribution of methamphetamine, violations of 21 U.S.C. § 841(a)(1), (b)(1)(B). Both Garcia and Maldonado entered pleas of not guilty.[2]

Before trial, Maldonado and Garcia moved to suppress any statements or evidence obtained from them during the investigation on Fourth, Fifth, and Sixth Amendment grounds. A magistrate judge[3] held a hearing on the motions, during which the Government represented that it had no "statements or confessions." Based on this representation, the magistrate judge denied the motions to suppress statements as moot and noted his intent to address the motions to suppress evidence separately in a report and recommendation. The Government then filed a memorandum

---

[2] The trial proceeded without Rodriguez, who was a fugitive.

[3] The Honorable Arthur J. Boylan, Chief Magistrate Judge, United States District Court for the District of Minnesota.

clarifying that, although it did not intend to introduce any confessions by the defendants, it did intend to introduce "statements made by them relating to their identities."

Subsequently, the magistrate judge issued his report and recommendation, concluding that the December 10 vehicle stop did not violate the Fourth Amendment and that, accordingly, "[s]uppression of the defendants' identification, or any other . . . statements that may have been obtained subsequent to the vehicle stop, is not required on the ground that the stop was unlawful." Maldonado objected to the magistrate judge's report and recommendation, renewing his Fourth Amendment objection to the vehicle stop and further arguing that the introduction of any information gained from questioning the occupants of the vehicle would violate *Miranda v. Arizona*, 384 U.S. 436 (1966). After *de novo* review, the district court adopted the report and recommendation and denied the motions to suppress, rejecting Maldonado's *Miranda* argument. The case proceeded to trial.

On the second day of trial, the defendants informed the court that relatives of two of the jurors had been observing the trial and had been present in the courtroom for several proceedings that were held outside the presence of the jury. Because Garcia and Maldonado were concerned that the relatives and jurors might have discussed proceedings that took place outside the presence of the jury, they moved for a mistrial. The court questioned the two jurors to determine whether they had spoken to their relatives about the case. One of the jurors told the court that her relative had informed her that the defendants were escorted in each morning by officers, but she adamantly denied communicating this information to any other jurors. The other juror informed the court that she scrupulously had avoided discussing the trial with her relative. The court immediately dismissed the juror who had learned of the defendants' custodial status but allowed the other juror to remain on the jury, after instructing her to continue to avoid discussing the trial with her relative.

The jury returned a verdict of guilty on all counts. Both Garcia and Maldonado moved for a judgment of acquittal or for a new trial, challenging the sufficiency of the evidence and alleging that the jury was tainted. The district court denied the motions, and Garcia and Maldonado filed this appeal.

## II.    DISCUSSION

### A.    Sufficiency of the Evidence—Garcia

Garcia appeals the district court's denial of his Fed. R. Crim. P. 29 motion for judgment of acquittal. We review such a denial *de novo*, "viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." *United States v. Yarrington*, 634 F.3d 440, 449 (8th Cir. 2011) (quoting *United States v. Scofield*, 433 F.3d 580, 584-85 (8th Cir. 2006)). We will reverse "only if no reasonable jury could have found [the defendant] guilty beyond a reasonable doubt." *United States v. Winn*, 628 F.3d 432, 439 (8th Cir. 2010). Garcia also challenges the denial of his motion for a new trial on sufficiency grounds. We review this denial for abuse of discretion. *United States v. Aguilera*, 625 F.3d 482, 486 (8th Cir. 2010). "The decision to grant or deny a motion for a new trial based upon the weight of the evidence is within the sound discretion of the trial court," but "[u]nless the district court ultimately determines that a miscarriage of justice will occur, the jury's verdict must be allowed to stand." *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002).

To support a conviction for conspiracy to distribute methamphetamine, the Government must prove that (1) a conspiracy to distribute methamphetamine existed; (2) the defendant knew about the conspiracy; and (3) the defendant knowingly became a part of the conspiracy. *See United States v. Moran*, 612 F.3d 684, 690 (8th Cir. 2010), *cert. denied*, 562 U.S. ---, 131 S. Ct. 953 (2011). To prove distribution of methamphetamine, the Government must show that the defendant knowingly sold or

otherwise transferred methamphetamine. *See United States v. Aguilar-Portillo*, 334 F.3d 744, 747 (8th Cir. 2003). Garcia does not specify whether he challenges the sufficiency of the evidence supporting the conspiracy count, the distribution counts, or both. Nor does he identify which elements of either offense he believes the Government failed to prove. Instead, he makes three specific challenges to the Government's evidence of his involvement in the November 24 meeting and the December 2 and 10 transactions.

First, Garcia suggests that there was insufficient evidence to establish that he was present during the November 24 meeting, which was not the subject of a distribution count but was alleged to be part of the conspiracy. We disagree. Although Officer Hauge testified that he did not personally see Garcia on November 24, Sergeant Snyder testified that he was able to get a good look at him at the restaurant parking lot through binoculars and identified Garcia in court as one of the people he observed.[4] Further, Sergeant Wente took a photograph at the parking lot during the November 24 meeting and later made an in-court identification of Garcia as the man in the photograph. Both Sergeant Wente and Officer Hauge also testified that Garcia was in the Dodge Dakota when it was stopped after the meeting.[5] The in-

---

[4] We are not persuaded by Garcia's suggestion that Officer Hauge's testimony confused the jury because at one point he purported to identify Garcia but later testified that he did not personally observe Garcia on November 24. Officer Hauge unambiguously testified that he did not personally see Garcia during the meeting. Garcia also challenges the district court's decision to allow Officer Hauge to testify regarding the recorded conversation between Garcia and Morales on November 24, on the grounds that Officer Hauge does not speak Spanish. We reject this argument because the transcript of this conversation was translated into English and Garcia does not challenge the accuracy of the translation.

[5] Garcia challenges as hearsay Sergeant Wente's identification of him as present in the Dodge Dakota when it was stopped on November 24 because the court allowed Sergeant Wente to refer to a police report written by Officer Hauge. We reject this challenge because Sergeant Wente identified Garcia as one of the occupants of the Dakota before referring to the police report.

court identifications by Sergeants Snyder and Wente constituted sufficient evidence for a reasonable jury to conclude that Garcia was present during the November 24 meeting; nor did the district court abuse its discretion in denying the motion for a new trial in this regard.[6]

Next, Garcia challenges the sufficiency of the evidence of his involvement in the December 2 controlled buy, opining that "there is insufficient evidence to identify the person who made the transaction, and no credible evidence it was Garcia." Garcia is incorrect. Sergeant Snyder identified Garcia, whom he recognized from the November 24 meeting, as participating in the transaction. Moreover, the Government's evidence showed that the transaction took place at the apartment building in which Garcia resided, and the officers observed Garcia using the same Dodge Dakota that had been used on November 24. These additional facts provided significant circumstantial evidence supporting Sergeant Snyder's affirmative identification of Garcia. Taken together, this evidence is sufficient to support the conclusion beyond a reasonable doubt that Garcia participated in the December 2 transaction, and the district court did err in denying judgment of acquittal or abuse its discretion in denying Garcia's motion for a new trial in this respect.

Finally, Garcia attacks the sufficiency of the evidence supporting his participation in the December 10 transactions, arguing that the Government did not establish "that Garcia was anything more than present at the scene on December 10." We are unpersuaded. Testimony by Special Agent Hage, Officer Sass, and Urbina, a confidential informant, established that on two occasions on December 10 Rodriguez obtained a package containing drugs from a vehicle occupied by Garcia and then sold that package to the confidential informant. Moreover, the evidence we

_____

[6] Garcia also challenges the Government's decision not to call Morales, its confidential informant, to testify about the November 24 meeting. Since there was sufficient evidence to establish Garcia's participation in the meeting without Morales's testimony, we reject this challenge.

already have surveyed established that Garcia discussed illicit drug transactions with Morales and provided him with a sample of methamphetamine on November 24, and sold Morales methamphetamine on December 2. A reasonable jury was entitled to conclude from this evidence that Garcia was "more than present" at the December 10 controlled buy, and the district court also did not abuse its discretion in refusing to grant Garcia a new trial on this basis.

### B. Motion to Suppress—Maldonado

Maldonado appeals the district court's refusal to suppress the phone number that he gave to the Minneapolis police officers during the December 10 vehicle stop, which was instrumental in establishing at trial that he had talked to Rodriguez over the phone 279 times between November 27 and December 22, 2009. On appeal from the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Fiorito*, 640 F.3d 338, 344 (8th Cir. 2011).

First, Maldonado suggests that the Government should have been precluded from introducing the information derived from his phone number at trial because the prosecutor initially claimed at the suppression hearing not to possess any "statements or confessions," which Maldonado interprets as encompassing the statements he gave the police regarding his identity and phone number. This contention fails to persuade. Even assuming that Maldonado's interpretation of this representation is reasonable, the Government swiftly clarified that it intended to introduce "statements made by [Maldonado] relating to [his] identit[y]," and after conducting an evidentiary hearing the magistrate judge recommended that "[s]uppression of the defendants' identification, . . . or statements that may have been obtained subsequent to the vehicle stop" was not required. Indeed, Maldonado was aware of the Government's intention to use the defendants' identification statements in sufficient time to challenge their use in his objections to the magistrate judge's report and recommendation. We conclude

that, at least by this point, Maldonado was no longer entitled to rely on his interpretation of the Government's initial representation that it did not possess any "statements or confessions" by him. *See United States v. Salcedo*, 360 F.3d 807, 810 (8th Cir. 2004) (affirming the district court's admission of defendant's inculpatory statement, despite the Government's initial representation that it did not intend to introduce any statements by defendant at trial, in part because the Government elsewhere had disclosed the existence of the statement and "[t]here is no indication the government attempted to unfairly surprise [the defendant], nor is there any indication [he] was unfairly surprised").

Next, Maldonado objects to the admission of the information derived from his phone number on Fourth Amendment grounds. On appeal, he does not challenge the district court's determination that the police officers had reasonable suspicion to conduct an investigative stop of the Dodge Dakota on the night of December 10, based on the information relayed to them by the DEA task force members that the occupants of the Dakota had been involved in drug transactions earlier that day. *See United States v. Williams*, 139 F.3d 628, 629-30 (8th Cir. 1998). He also admits that an officer conducting an investigative stop "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). However, Maldonado now contends that, by asking for his phone number, the officers exceeded the permissible scope of the investigative detention. Because Maldonado failed to make any argument related to the scope of the investigative stop before the district court, our review is limited to plain error. *See United States v. Cardenas-Celestino*, 510 F.3d 830, 833 (8th Cir. 2008).[7] We will reverse only if

---

[7] "Our court has 'not yet decided whether the failure to raise a suppression matter in a timely pretrial motion precludes plain error review.'" *United States v. James*, 534 F.3d 868, 875 (8th Cir. 2008) (quoting *Cardenas-Celestino*, 510 F.3d at 833). We assume without deciding that plain error relief would be available, since we conclude that Maldonado has not shown plain error in any event.

-10-

Maldonado shows that the district court committed an error that was plain, that affected his substantial rights, and that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Meeks*, 639 F.3d 522, 526-27 (8th Cir. 2011).

"After making an otherwise lawful *Terry* stop, an officer may conduct an investigation 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Banks*, 553 F.3d 1101, 1105 (8th Cir. 2009) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). "[Q]uestions concerning a suspect's identity are a routine and accepted part of many *Terry* stops." *Hiibel v. Sixth Jud. Dist. Court of Nev., Humboldt Cnty.*, 542 U.S. 177, 186 (2004). "Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder. On the other hand, knowing identity may help clear a suspect and allow the police to concentrate their efforts elsewhere." *Id.* However, "the request for identification [must be] reasonably related to the circumstances justifying the stop." *Id.* at 188. Similarly, the Supreme Court has suggested that "the Fourth Amendment [might] permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act," but only "if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime." *Hayes v. Florida*, 470 U.S. 811, 817 (1985).

Applying these principles, we believe that the request for Maldonado's phone number was properly within the scope of the investigative stop. The DEA task force members had observed the involvement of the two occupants of the Dodge Dakota in two drug transactions earlier that day. The confidential informant had arranged both of the December 10 transactions by phone, and the members of the task force knew the phone number of at least one of the suspects. Under these circumstances, the officers conducting the investigative stop could reasonably conclude that learning the phone numbers of the occupants of the Dodge Dakota might "establish or negate

[their] connection with [the] crime," *Hayes*, 470 U.S. at 817, and that this information was "'reasonably related in scope to the circumstances that initially' prompted the stop." *See United States v. Shafer*, 608 F.3d 1056, 1062 (8th Cir. 2010) (quoting *United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004)). Accordingly, we conclude that Maldonado has failed to demonstrate error, let alone plain error.

Finally, Maldonado argues that his statement giving the police officers his phone number should have been suppressed because it was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). "The Supreme Court in *Miranda* stated that warnings are required when interrogation is initiated by law enforcement officers after a person has been taken into custody" and whether an individual is in custody "ultimately turn[s] on whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Boslau*, 632 F.3d 422, 427 (8th Cir. 2011) (internal citation and quotation marks omitted). Whether a defendant was "in custody" for *Miranda* purposes is a question of law that we review *de novo*. *United States v. Muhlenbruch*, 634 F.3d 987, 995 (8th Cir. 2011).

In this case, the Minneapolis police officers asked Maldonado for his name and phone number in the context of a brief investigative stop. The Supreme Court recently reaffirmed that "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. ---, 130 S. Ct. 1213, 1224 (2010) (internal citation omitted) (citing *McCarty*, 468 U.S. at 439-40); *see also United States v. Morse*, 569 F.3d 882, 884 (8th Cir. 2009). Because the record establishes that Maldonado never was subjected to "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest," *Boslau*, 632 F.3d at 427 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)), the district court was correct to conclude that he was not "in custody" for *Miranda* purposes when he gave the officers his phone number.

## C.    Sufficiency of the Evidence—Maldonado

Maldonado also appeals the district court's refusal to grant his motion for judgment of acquittal on the count of conspiracy to distribute fifty grams or more of methamphetamine.[8]  To support this conviction, the Government was required to prove that (1) a conspiracy to distribute methamphetamine existed; (2) Maldonado knew about the conspiracy; and (3) Maldonado knowingly became a part of the conspiracy.  *See Moran*, 612 F.3d at 690.  "In addition, the government must demonstrate that the conspiracy involved the purported drug quantity, in this case at least fifty grams of actual methamphetamine."  *Id.*  Maldonado challenges the sufficiency of the evidence that he knowingly became part of a conspiracy, noting that "mere association with individuals engaged in illegal conduct is not sufficient."  He also challenges the sufficiency of the evidence supporting the jury's determination that the conspiracy involved at least fifty grams of methamphetamine.

We conclude that there was sufficient evidence to establish that Maldonado knowingly became a part of a conspiracy to distribute methamphetamine.  "[B]ecause the nature of conspiracy entails secrecy, the agreement and members' participation in [the conspiracy] must often be established by way of inference from the surrounding circumstances."  *United States v. Jiminez*, 487 F.3d 1140, 1146 (8th Cir. 2007) (alterations in original) (quoting *United States v. Cabrera*, 116 F.3d 1243, 1245 (8th Cir. 1997)).  The Government's evidence established that on two separate occasions on December 10, Maldonado and Garcia arrived in the same Dodge Dakota at the

---

[8] Like Garcia, Maldonado also raised his sufficiency challenge before the district court in the context of a Fed. R. Crim. P. 33 motion for a new trial.  However, Maldonado makes no argument on appeal that the district court abused its discretion in denying his motion for a new trial.  Therefore, we read Maldonado's challenge to the sufficiency of the evidence as an appeal only of the denial of his motion for judgment of acquittal and will reverse "only if no reasonable jury could have found [him] guilty beyond a reasonable doubt."  *Winn*, 628 F.3d at 439.

scene of a controlled drug buy and supplied Rodriguez with the methamphetamine that he then sold to a confidential informant. Further, Rodriguez's phone records showed that there were a total of twenty-five calls between him and Maldonado on December 10. Special Agent Hage provided expert testimony to the effect that the first person called by a drug supplier after a controlled buy is arranged is likely to be involved in the conspiracy. And Rodriguez's phone records showed that each time the DEA's confidential informant arranged a transaction with him, Rodriguez immediately called Maldonado. A reasonable jury could conclude beyond a reasonable doubt, based on this evidence, that Maldonado was engaged in a conspiracy with Garcia and Rodriguez to distribute methamphetamine. *See United States v. Smith*, 632 F.3d 1043, 1046 (8th Cir. 2011) (affirming a conviction for conspiracy to distribute cocaine based in part on cell phone records of numerous calls between the members of the conspiracy).

Moreover, sufficient evidence supported the jury's drug quantity determination. Maldonado contends that in order to reach the 50 grams of methamphetamine alleged in the conspiracy count, the jury must have held him responsible for the 25.3 grams of methamphetamine distributed on December 2 as well as the 43.8 grams distributed on December 10. Maldonado argues that no direct evidence establishes that he was present at the December 2 transaction. However, "a defendant in a conspiracy may be 'held responsible for all reasonably foreseeable drug quantities that were in the scope of the criminal activity that he jointly undertook.'" *United States v. Littrell*, 439 F.3d 875, 881 (8th Cir. 2006) (quoting *United States v. Jimenez-Villasenor*, 270 F.3d 554, 561 (8th Cir. 2001)). There was sufficient evidence for the jury to conclude that Garcia and Maldonado's conspiracy to distribute methamphetamine extended from December 10 at least as far back as December 2. The December 2 transaction took place in the parking lot of the apartment building where both Maldonado and Garcia resided, and to which the police had followed Garcia on November 24. *See Meeks*, 639 F.3d at 527-28 (relying on testimony that defendants were selling drugs out of the same apartment in affirming a conviction for conspiracy to distribute cocaine).

Further, the evidence supported the inference that Rodriguez was part of the conspiracy, and  Rodriguez's cell phone records established that there was a total of 279 calls between Rodriguez and Maldonado from November 27 to December 22. Indeed, the cell phone records showed that, just as on December 10, there were twenty-five phone calls between Rodriguez and Maldonado on December 2, providing further evidence that Maldonado was participating in the conspiracy at that point. *See Smith*, 632 F.3d at 1046.  Accordingly, a reasonable jury could have concluded that Maldonado became part of the conspiracy at least as early as December 2, and the amount of methamphetamine distributed on that date properly is attributable to him. *See Littrell*, 439 F.3d at 881.  The district court did not err in denying Maldonado's motion for judgment of acquittal.

### D.     Jury Contamination

Both Garcia and Maldonado appeal the district court's refusal to grant a new trial based on alleged jury contamination.  We review the district court's denial of a motion for a new trial for abuse of discretion. *United States v. Johnson*, 639 F.3d 433, 442 (8th Cir. 2011).  We find no such abuse here.  Once the accusation of contamination was leveled, the district court immediately questioned the two jurors involved.  When the first juror informed the court that she had learned of the defendants' custodial status, a possible violation of *Estelle v. Williams*, 425 U.S. 501, 512 (1976), the court first satisfied itself that the juror had not shared this information with any other jurors and then promptly excused her from further service.  The court found credible the assurances of the second juror that she had not discussed the trial with her relatives and allowed her to remain on the jury after admonishing her to continue avoiding discussion of the trial with others.  Garcia and Maldonado have given us no reason to second-guess the court's determination that the jurors' accounts were credible. *See United States v. Hall*, 497 F.3d 846, 852 (8th Cir. 2007) (noting that "a district court's credibility determinations are 'virtually unassailable on appeal'" (quoting *United States v. Watson*, 479 F.3d 607, 611 (8th Cir. 2007))); *see also United*

-15-

*States v. Console*, 13 F.3d 641, 669 (3d Cir. 1993) (upholding the district court's determination that a juror's "allegation that other jurors were reading newspaper accounts of the case was not credible" because "the district court had the opportunity to observe [the juror's] demeanor when she made the allegation"). Accordingly, we conclude that the district court acted properly to isolate and remove the jury contamination and did not abuse its discretion in declining to grant a new trial on this basis.

## III. CONCLUSION

For the foregoing reasons, Garcia's and Maldonado's convictions are affirmed.

_____