# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-1361

_____

United States of America

*Plaintiff - Appellee*

v.

Charles Sacus, also known as Hi-C

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 16, 2015
Filed: April 30, 2015

_____

Before WOLLMAN, SMITH, and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

Charles Sacus pleaded guilty to two counts of distributing illegal drugs, in violation of 21 U.S.C. § 841(A)(1), and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The district court[1] sentenced Sacus

_____

[1]The Honorable Audrey G. Fleissig, United States District Judge for the Eastern District of Missouri.

to 144 months' imprisonment for each drug offense and 120 months' imprisonment for the firearm offense to be served concurrently. Sacus appeals his sentence for the firearm offense arguing that the district court miscalculated the number of firearms he possessed and that he was a victim of sentencing manipulation. Sacus also appeals the sentences for his drug offenses, claiming that they violate his Eighth Amendment right against cruel and unusual punishment. We affirm.

I. *Background*

On February 25, 2013, agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives (BATF) began an undercover operation in St. Louis, Missouri, aimed at illegal firearms sales. BATF agents operated a fake tattoo parlor that the agents used as a staging area to set up stings for illegal sales.

On February 25th, after receiving a police tip, an undercover agent went to a nearby store to investigate potential drug transactions in the parking lot. When the agent initially approached the store's parking lot, he saw Sacus make a hand-to-hand drug sale. When Sacus later approached the agent in the parking lot, the agent asked Sacus if he had any drugs for sale. Sacus indicated that he did, and the agent responded by telling Sacus to meet him at the tattoo parlor to facilitate the transaction. Sacus later went to the tattoo parlor and made two heroin sales to undercover agents. On March 4, 2013, Sacus returned to the tattoo parlor and this time made two cocaine base sales to undercover agents.

During Sacus's initial visit to the tattoo parlor on February 25, 2013, agents asked Sacus if he knew anyone who was interested in selling firearms. On February 28, 2013, Sacus returned to the tattoo parlor with another individual, Larry Lee. Lee told agents that he could obtain the firearms that the agents sought. A month later, Sacus and Lee entered the parlor together, and Lee offered to sell the agents an assault rifle. Sacus also asked for a "finder's fee" for arranging the transaction. The agents bought the firearm from Lee for $650; the agents also paid Sacus $50 for

arranging the transaction. Sacus and Lee continued to come to the parlor together to sell firearms to the agents through May 14, 2013. Sacus continued to receive a finder's fee from these transactions.

On May 14, 2013, the pattern of firearms sales slightly changed. After selling his tenth firearm with Sacus earlier that day, Lee returned to the tattoo parlor for a solo transaction. Lee sold an eleventh firearm to the agents without Sacus present. The agents paid Sacus a finder's fee for arranging that deal when they saw him the next day. After May 14, 2013, Lee returned on his own to the tattoo parlor to sell weapons. Sacus received no payment for these transactions.

Sacus also came to the parlor alone on several occasions and sold firearms to the agents. Sacus sold six firearms by himself with no connection to Lee. When the undercover operation ended on June 6, 2013, agents had acquired a total of 17 firearms through dealing with Sacus: six firearms that Sacus sold to agents by himself and 11 firearms that Lee sold to agents for which Sacus received a fee for arranging the transaction. Many of these firearms were later determined to be stolen.

Throughout the operation, the undercover agents conversed with Sacus to establish their cover identities. Although the BATF agents did not really "have a criminal history," they "indicate[d] to [Sacus] in [their] undercover capacity that [they] had a criminal history." The senior agent working the case, Special Agent Mark Demas, testified at Sacus's sentencing hearing that he told Sacus that he had "previously been convicted and served a prison sentence," had "two strikes in California," and served nearly a "15-year sentence in Kentucky." Also, Agent Demas told Sacus that the guns that he was acquiring would either be taken "south, meaning Mexico," or would be sold to a biker gang in California that he used to ride with. Later conversations included representations that the "Mexicans will love" the firearms that Sacus and Lee were providing.

At Sacus's sentencing hearing, Agent Demas—who had 25 years of experience as an agent—testified he had participated in "probably a hundred" federal undercover operations. Agent Demas explained why he gave his undercover identity certain specific factual features. He testified that telling Sacus that he had a criminal history added value to his cover because "if you tell a defendant or prospective defendant that you have a criminal history, sometimes it eases the fact that you're a new guy in the neighborhood and nobody knows you. . . . And . . . I want them to realize they're not dealing with a choir boy." Agent Demas further testified that the reason that he told Sacus that the firearms were going to either Mexico or to a criminal biker gang was because "when you have a line where they're going to Mexico or they're going to a criminal organization, it gives you a reason to buy numerous weapons or additional weapons rather than just one time." Despite his extensive history and his familiarity with the Sentencing Guidelines, Agent Demas testified that he did not know that the specific attributes his cover identity possessed could be used to enhance Sacus's sentence. Sacus did not challenge the credibility of Agent Demas's statement of ignorance of sentence enhancing factors under the Guidelines.

The district court applied a four-level enhancement to Sacus's offense level for possessing 17 firearms under § 2K2.1(b)(1)(B) of the Guidelines. The court found that Sacus possessed the six firearms that he sold to the undercover agents independently and also possessed the 11 firearms that Lee sold to the agents for which Sacus received a finder's fee. First, the court found that Sacus was involved in "joint criminal activity" described in § 1B1.3 of the Guidelines. Alternatively, the court reasoned that Sacus constructively possessed the firearms. The court also found that on certain occasions, Sacus asserted more control over the negotiation of the sale, which justified a finding for possessing the requisite number of firearms for application of the four-level enhancement.

The district court also applied an additional four-level enhancement for trafficking under § 2K2.1(b)(5). First, the court found that Sacus "had reason to

believe that [he was] selling these firearms to a prohibited person, namely the undercover agent who repeatedly told them and discussed with them the fact that he had not just one, but multiple convictions that resulted in significant sentences, certainly more than a year." Thus, Sacus had reason to believe that he was selling the firearms to someone who was "prohibited from possessing them," which fits under the application of the trafficking enhancement. Second, Sacus had reason to believe that these guns were going to be transferred to a motorcycle gang in California for likely unlawful purposes. Therefore, he had reason to believe that he was "selling these firearms to individuals who intended to use them unlawfully," which also justifies application of the enhancement. Third, Sacus had reason to believe some of the guns might be transferred to Mexico, which is another independent grounds for applying the enhancement.

Finally, the district court applied a four-level enhancement under § 2K2.1(b)(6) for possessing a firearm Sacus had reason to believe would be transported out of the country, possessing a firearm in connection with another felony, or transferring a firearm with the belief it would be used in a felony. The court found this enhancement applied based on many of the same facts as the § 2K2.1(b)(5) enhancement.

For sentencing purposes, the district court grouped Sacus's drug offenses together with his felon-in-possession-of-a-firearm offense under § 3D1.2(d) of the Guidelines. The base offense level for being a felon in possession of a firearm is 20. U.S.S.G. § 2K2.1(a)(4)(B). The district court added two levels because several of the firearms sold to the undercover agents were stolen, which Sacus did not contest. *Id.* § 2K2.1(b)(4)(A). The district court added four levels for possessing 17 firearms, four levels for trafficking, and four levels for selling the firearms to someone he knew should not have it or for selling firearms that he knew would be taken out of the country. *Id.* § 2K2.1(b)(1), (5), (6). The court then subtracted two levels for Sacus's acceptance of responsibility and subtracted one level for assisting the government in the investigation of misconduct. *Id.* § 3E1.1(a)–(b). This calculation resulted in a total

offense level of 31. The court also found that Sacus had a criminal history category of IV. The district court thus calculated the Guidelines range at 151–188 months' imprisonment for each of the three counts against Sacus.

After considering the relevant under 18 U.S.C. § 3553(a) factors, the district court varied downward on Sacus's drug offenses to two 144-month sentences. The court justified its downward variances as an effort to avoid excess disparity between Sacus's sentence and Lee's sentence, who received a sentence of 120 months' imprisonment. Also, the court considered Sacus's drug dependancy, his long history of drug abuse, and his learning disability. The court sentenced Sacus to 120 months' imprisonment—the statutory maximum—for being a felon in possession of a firearm. *See* 18 U.S.C. § 924(a)(2).

## II. *Discussion*

Sacus argues on appeal that the district court erred by finding that he possessed 17 firearms when he only sold six to agents on his own. He also argues that he was the victim of sentencing manipulation because the district court imposed several sentencing enhancements based on information that the undercover agents communicated to Sacus. Finally, Sacus argues that his 144-month sentences for his two drug crimes are so excessive, they violate his Eighth Amendment right to be free from cruel and unusual punishment.

## A. *Number of Firearms*

Sacus first argues that the district court committed procedural error by finding that he possessed 17 firearms. He contends that the court thereby erroneously enhanced his total offense level by two levels pursuant to § 2K2.1(b)(1) of the Guidelines. "This court reviews de novo the interpretation and application of the sentencing guidelines." *United States v. Smart*, 501 F.3d 862, 866 (8th Cir. 2007) (citing *United States v. Okai*, 454 F.3d 848, 852 (8th Cir. 2006)). "The sentencing court's quantity calculations are factual findings, reviewed for clear error on appeal.

Only the preponderance-of-the-evidence standard is required to find sentence-enhancing facts." *Id.* at 867 (citations omitted). "Only if we have a definite and firm conviction that a mistake has been made will we reverse the sentencing court's factual findings." *United States v. Augustine*, 663 F.3d 367, 374 (8th Cir. 2011) (quotations and citations omitted).

Section 2K2.1(b)(1) imposes enhancements for felons possessing multiple firearms. Sacus concedes that he possessed the six firearms that he sold to the undercover agents by himself, but he argues that he did not possess the other 11 firearms for which he received a finder's fee. Whereas subsection (b)(1)(A) imposes a two-level enhancement for possessing three to seven firearms, subsection (b)(1)(B) imposes a four-level enhancement for possessing 8 to 24 firearms. Thus, Sacus argues that the district court wrongly added two levels to his total offense level by erroneously finding that he possessed 17 firearms.

We agree with the district court that Sacus jointly possessed the 11 firearms that Lee sold for which Sacus received a finder's fee based on § 1B1.3(a)(1) of the Guidelines. This section states that "specific offense characteristics . . . shall be determined on the basis of . . . foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . . that occurred during the commission of the offense of conviction." U.S.S.G. § 1B1.3(a)(1)(B).

"In determining the scope of the criminal activity that the particular defendant agreed to jointly undertake . . . , the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Id.* § 1B1.3, cmt.2. While there is no evidence of an explicit agreement between Sacus and Lee, the district court did not err by reasonably inferring from their conduct that the two had an implicit agreement. Sacus and Lee worked in concert to sell a total of 11 firearms to undercover agents. Both Sacus and Lee brought value to the transaction and were compensated accordingly. Sacus provided access to the buyer

while Lee provided access to the firearms. Consequently, the number of transactions, the pattern of the transactions, and the fact that both were compensated for the transactions all support the conclusion that Sacus and Lee had an implicit agreement to illegally sell firearms.[2] Therefore, Sacus can be held accountable for the offense-specific fact of the number of firearms that he jointly possessed with Lee in furtherance of a joint criminal enterprise. Not only were these sales foreseeable by Sacus, but Sacus was actually present for the majority of them. *See, e.g.*, *United States v. Vega*, 720 F.3d 1002, 1003–04 (8th Cir. 2013) (finding that § 1B1.3(a) applied to hold a defendant accountable for the number of firearms his codefendants possessed when they all participated in the theft of the firearms). Because Sacus's implicit agreement to sell 11 firearms supports the four-level enhancement, we need not discuss the district court's alternative reasons for applying the enhancement.

## B. *Sentencing Manipulation*

Sacus next argues that his Fifth Amendment due process rights were violated because the district court procedurally erred by applying the four-level enhancements under § 2K2.1(b)(5) and (6). Sacus argues that it was procedural error for the district court to base these enhancements on "fictitious facts in statements [by] . . . agents made during their undercover sting operation." Specifically, Sacus focuses on the following aspects of the undercover agents' cover identities: (1) that an agent served more than one year in prison for a felony offense; (2) that an agent belonged to an

---

[2]Both Sacus's and Lee's solo transactions with the undercover agents bolster the finding of a criminal enterprise. The solo transactions show that Sacus and Lee cooperated to sell firearms when one partner needed the value that the other partner brought to the table. Thus, when the other partner's value in the transaction diminished, the two no longer needed to work together. When Sacus did not need Lee's access to firearms, he cut Lee out of the transaction and sold six firearms alone. When Lee developed a relationship with the undercover agents, he no longer needed Sacus to arrange the transactions and omitted Sacus from future transactions.

outlaw motorcycle gang; and (3) that the firearms the agents wanted to buy would be transported out of the country to Mexico.

In the context of a downward departure, we have said that in order to succeed on a claim of sentencing manipulation, "the defendant bears the burden to prove by a preponderance of the evidence 'that the officers engaged in [conduct] . . . solely to enhance [the defendant's] potential sentence.'" *United States v. Torres*, 563 F.3d 731, 734 (8th Cir. 2009) (quoting *United States v. Baber*, 161 F.3d 531, 532 (8th Cir. 1998)). Therefore, we will not find sentencing manipulation when there is evidence of legitimate law enforcement goals and purposes. *United States v. Moran*, 612 F.3d 684, 692 (8th Cir. 2010) (no sentencing manipulation when law enforcement had legitimate investigative reasons for increasing drug buys and when the officers testified they did not know that such buys would increase the defendant's sentence); *Torres*, 563 F.3d at 735 (no sentencing manipulation when law enforcement conducted multiple controlled buys of illegal drugs to find sources of distribution and find out how much drugs the defendant was willing to sell).

Sacus's due process claim of sentencing manipulation fails. Agent Demas gave specific and legitimate law enforcement reasons for telling Sacus that his cover identity had a criminal history, that his cover identity was involved with an outlaw biker gang, and that the firearms he was purchasing would be transported out of the country. Agent Demas's experience provided reasonable rationales for representing to potential defendants that he has a criminal history aside from sentencing ramifications. A recent prison release would explain his newness to the neighborhood and why nobody knew him. This would also mesh with telling Sacus that he belonged to an outlaw biker gang. Agent Demas testified that he wanted to let potential defendants know that he was not a "choir boy," but instead someone with reason and willingness to purchase illegal firearms. On one occasion, Sacus and Lee told Agent Demas that they did not want to go back to prison for this activity, to which Agent Demas replied that he had served a long prison sentence and did not want to go back

either. Finally, Agent Demas testified that telling potential defendants that the firearms would be transported to Mexico or to an outlaw biker gang gives him an avenue to buy as many firearms as potential defendants are willing to sell. Agent Demas testified that giving the impression that he is involved with a large organization diminishes a seller's suspicion when he seeks to obtain a large number of firearms through repeated purchases. Sacus provided no evidence that these legitimate law enforcement reasons were solely a ruse for sentence enhancement. As the witness in *Moran*, Agent Demas testified that he did not know that these attributes would enhance Sacus's sentence at the time of the investigation. Because Agent Demas's credibility was never challenged, the district court did not err in relying on his testimony.

## C. *Cruel and Unusual Punishment*

Finally, Sacus argues that his two sentences of 144 months' imprisonment for his drug offenses are excessive and that they violate his Eighth Amendment right against cruel and unusual punishment. "This court reviews Eighth Amendment challenges de novo." *United States v. Vanhorn*, 740 F.3d 1166, 1169 (8th Cir. 2014) (citation omitted).

Sacus's sentence of 144 months' imprisonment is within the statutory range of "not more than 20 years" for his drug offenses. 21 U.S.C. § 841(b)(1)(C). "This court has never held a sentence within the statutory range to violate the Eighth Amendment." *Vanhorn*, 740 F.3d at 1170. Sacus fails to show that his is "the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Id.*

## III. *Conclusion*

For the reasons stated herein, we affirm.

_____

-10-